Richard **LEBERMAN,**
**Plaintiff–Appellee,**

v.

**JOHN BLAIR & COMPANY,**
**Defendant–Appellant.**

**No. 1075, Docket 89–7075.**

United States Court of Appeals,
Second Circuit.

Argued April 28, 1989.

Decided July 25, 1989.

Andrew B. Donnellan, Jr., New York City (Blair C. Fensterstock, New York City, of counsel), for defendant-appellant.

Craig P. Murphy, New York City (Windels, Marx, Davies & Ives, New York City, of counsel), for plaintiff-appellee.

James I.K. Knapp, Acting Asst. Atty. Gen., Gary R. Allen, Ann Belanger Durney, Calvin C. Curtis, Tax Div., Dept. of Justice, Washington, D.C., Benito Romano, U.S. Atty., S.D.N.Y., New York City, of counsel, for amicus. curiae United States of America.

Before OAKES, Chief Judge, TIMBERS and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

John Blair & Company (Blair) appeals from a judgment of the United States District Court for the Southern District of New York, Kram, J., entered on January 4, 1989, after the court granted Richard Leberman's motion for summary judgment, denied Blair's cross-motion for summary judgment and awarded Leberman damages, attorney's fees and disbursements. Federal jurisdiction is based on diversity of citizenship of the parties. The judgment in favor of Leberman was as follows: "(a) [i]n the principal amount of $511,988.00 plus interest ... (b) [i]n the principal amount of $165,307.21 as the amount of reasonable attorneys' fees and disbursements ... and (c) [t]he costs of this action, to be determined by the Clerk of the Court." The award of $511,988 was to satisfy the terms of a January 1985 employment severance agreement and a September 1985 employment severance agreement. Because there were genuine issues of material fact concerning whether the terms of the January 1985 agreement were superseded by the September 1985 agreement and whether Leberman acted in good faith in determining the amount of severance payment that he was owed, the district court erred in granting summary judgment to Leberman. Accordingly, we reverse the judgment of the district court and remand for further proceedings.

## BACKGROUND

In February 1985, Leberman became Blair's Vice President and Chief Financial Officer. Under the terms of his employment agreement dated January 23, 1985 (the January Agreement), Leberman was to participate in Blair's restricted stock plan and in its Long–Term Incentive Unit Plan (Unit Plan). Under the terms of the restricted stock plan, Leberman was initially awarded 1,690 shares of stock. Later, in September 1985, Leberman was awarded 3,692 additional shares. Shares awarded to Leberman under this plan were to become vested if he remained in continuous employment with Blair and did not transfer the stock during a four year award cycle. The terms of that plan further provided that a change in control of Blair would cause the condition of continuous employment and the restrictions on the shares to

lapse, and ownership of the stock to vest immediately. Under the terms of the Unit Plan, Leberman was awarded 1,340 performance units. Vesting of the performance units depended on Leberman's continuous employment with Blair and Blair's performance level. The monetary value of the performance units would be determined in accordance with a formula provided in the Unit Plan. If an acquisition of control of Blair were to occur, the requirement of continuous employment would be waived and the performance units would vest immediately. The terms of the severance agreement contained in the January Agreement provided that, Leberman would "receive 1 year's severance, if [he were] terminated from John Blair & Company any time during [his] first 2 years of employment for other than cause."

Leberman and Blair entered into a Severance Compensation Agreement, dated September 27, 1985 (the September Agreement), which stated that in the event of a change in control of Blair, if Leberman's employment were terminated other than for death, disability, retirement or cause, or if Leberman were to terminate his employment for good reason, Blair would pay him a lump sum severance equal to three times his " 'annualized includible compensation for the base period' (as defined in Section 280G(d) of the Internal Revenue Code)." At the time of his termination in October 1986, Leberman's annualized includible compensation for the base period was $220,111.04. Section 4 of the September Agreement provided, in pertinent part, that

if the lump sum severance payment under this Section 4 ... either alone or together with other payments which [Leberman] has the right to receive from [Blair], would constitute a "parachute payment" (as defined in Section 280G of the [Internal Revenue] Code), such lump sum severance payment shall be reduced to the largest amount as will result in no portion of the lump sum severance payment under this Section 4 being subject to the excise tax imposed by Section 4999 of the [Internal Revenue] Code. The determination of any reduction in the lump sum severance payment under this Sec-

tion 4 pursuant to the foregoing proviso shall be made by [Leberman] in good faith, and such determination shall be conclusive and binding on [Blair].

The procedures for deciding whether to include the award of performance units in the "lump sum severance payment" calculations under the September Agreement included reading both the terms of the Unit Plan and the "Performance Unit Certificate" that awarded the specific number of performance units to Leberman.

Section 280G of the Internal Revenue Code, I.R.C. § 280G (West Supp.1989) (the Code), provides that "[n]o deduction shall be allowed [as a business expense] for any excess parachute payment." I.R.C. § 280G(a). An "excess parachute payment" is defined as "an amount equal to the excess of any parachute payment over the portion of the base amount allocated to such payment." I.R.C. § 280G(b)(1). The definition of "parachute payment" is found in section 280G(b)(2)(A) of the Code which provides that:

The term "parachute payment" means any payment in the nature of compensation to (or for the benefit of) a disqualified individual if—

(i) such payment is contingent on a change—

(I) in the ownership or effective control of the corporation, or

(II) in the ownership of a substantial portion of the assets of the corporation, and

(ii) the aggregate present value of the payments in the nature of compensation to (or for the benefit of) such individual which are contingent on such change equals or exceeds an amount equal to 3 times the base amount.

Section 4999 of the Code "impose[s] on any person who receives an excess parachute payment a tax equal to 20 percent of the amount of such payment." I.R.C. § 4999 (West 1989).

In September 1986, control of Blair was acquired by Reliance Capital Group L.P. (Reliance). Reliance's general partner was Reliance Capital Group, a subsidiary of Re-

liance Group Holdings, Inc. Leberman's employment was terminated on October 3, 1986.

Because of the termination of his employment, Leberman sought the amounts he felt were due him under both the January and the September Agreements. He contended that no reduction in the amount called for under the September Agreement was required to avoid the imposition of the excise tax under section 4999 of the Code. Blair disagreed with Leberman's calculation and refused to make any payments.

At Blair's request, Leberman obtained the opinion of a tax attorney to justify his argument that the amount of the September Agreement payment did not have to be reduced. He obtained the advice of tax attorney John Y. Taggart, who opined that the September Agreement did not supersede the January Agreement or affect Leberman's rights under the restricted stock or performance unit plans. Taggart further opined that "Mr. Leberman's termination resulted after the change in control, but was not contingent on it or necessarily resulted from the change of control—it resulted because the new owners decided to revise the executive structure of the company." Taggart advised that the payment of the restricted stock had occurred on the date the stock was awarded, not at the time of vesting, and therefore that the payment could not be contingent on the vesting. Taggart submitted his opinion to a colleague, Guy Maxfield, who was also a tax expert. Maxfield agreed that Taggart's opinion was correct. Based on Taggart's opinion that the payments were not contingent on the change in control, Leberman "determined that no reduction in the amount called for under Section 4 of the agreement of September 27, 198[5], [was] necessary to preclude the imposition of an excise tax under Section 4999 of the Internal Revenue Code." In a supplemental opinion, Taggart modified his position on the payments pursuant to the performance unit plan. He stated that the payments pursuant to the performance unit agreement were not contingent for purposes of section 280G because the payment might have been made to Leberman on the occur-

rence of events other than a change in control.

On November 25, 1986, Leberman filed suit seeking $195,000 in payment under the January Agreement and $660,333 in payment under the September Agreement. By late 1986, Blair paid Leberman $182,988 for his 5,382 shares of restricted stock and $134,000 for his 1,340 performance units. On January 2, 1987, pursuant to section 4 of the September Agreement, Blair paid Leberman $343,345.11 calculated as follows:

| | |
|---|---|
| Base Amount | $220,111.04 |
| Three Times Base Amount | 660,333.12 |
| Reduced by other payments which were contingent on the change in control of [Blair]: | |
| Restricted Stock (5,382 shares at $34 per share) | 182,988.00 |
| Performance Units (1,340 units at $100 per unit) | 134,000.00 |
| Net | 343,345.12 |
| Amount Paid (rounded down so that total is less than three times the base amount) | 343,345.11 |

Blair contends that by making this payment, in addition to those made for the restricted stock and the performance units, it fulfilled its obligations by paying Leberman a total of $660,333.11.

Leberman subsequently filed a motion for summary judgment and Blair cross-moved for summary judgment. In a Memorandum Opinion and Order filed November 25, 1987, the district court decided the motions for summary judgment. The court found that amounts payable to Leberman in the event of a change in the ownership or control of Blair were not solely "contingent" on the change and thus were not "parachute payments" subject to the provisions of section 280G of the Code and that Leberman had acted in good faith in determining that he was entitled to receive the full amount of severance awards under two severance agreements. The court awarded Leberman $511,988 and attorney's fees in an amount to be determined within thirty days of that order. Leberman was subsequently awarded attorney's fees and expenses totalling $165,307.21. The district court entered final judgment pursuant to the previous orders, and Blair appealed. We reverse.

## DISCUSSION

This case centers around a contract dispute between Leberman and Blair. Although the interpretation and application of section 280G of the Code were an integral part of the dispute, we need not determine the correct interpretation of that section of the Code. We need only determine whether the district court properly granted summary judgment on Leberman's claim that he acted in good faith in deciding that he was entitled to the full amount of the severance awards under both the January and the September Agreements.

■ "[A] motion for summary judgment should be granted only 'when, viewing the record in the light most favorable to the nonmoving party, the evidence offered demonstrates that there is no genuine issue of fact and that the moving party is entitled to judgment as a matter of law.'" *Pension Benefit Guaranty Corp. v. LTV Corp.*, 875 F.2d 1008, 1015 (2d Cir.1989) (quoting *Cinema North Corp. v. Plaza at Latham Associates*, 867 F.2d 135, 138 (2d Cir.1989) (citation omitted)). Here, genuine issues of material fact exist concerning (1) whether the September Agreement was intended to supersede the January Agreement, and (2) whether Leberman acted in good faith in making his determination under section 4 of the September Agreement. The district court therefore erred in granting summary judgment in favor of Leberman.

■ "In an action on a contract—such as the one before us—summary judgment is perforce improper unless the terms of the agreement are 'wholly unambiguous'" and no material facts are in dispute. *See Wards Co. v. Stamford Ridgeway Associates*, 761 F.2d 117, 120 (2d Cir.1985) (quoting *Heyman v. Commerce & Industry Ins. Co.*, 524 F.2d 1317, 1320 (2d Cir.1975)). When a written contract is ambiguous, a triable issue of fact exists as to its interpretation, thus precluding the entry of summary judgment. *See Bank of America Nat'l Trust & Sav. Ass'n v. Gillaizeau*, 766 F.2d 709, 715 (2d Cir.1985); *Rothenberg v. Lincoln Farm Camp, Inc.*, 755 F.2d 1017, 1019 (2d Cir.1985); *Schering Corp. v.*

*Home Ins. Co.*, 712 F.2d 4, 9 (2d Cir.1983). In the instant case, it is unclear whether the September Agreement was intended to supersede the January Agreement.

The introductory portion of the September Agreement explained that "[t]his Agreement sets forth the severance compensation which [Blair] agrees it will pay to [Leberman] if [Leberman's] employment with [Blair] terminates ... following a Change in Control of [Blair]." Section 8(b) of the September Agreement states that "[t]his Agreement shall not be construed as a modification of the terms of [Leberman's] employment, except as set forth expressly herein in respect of severance compensation." In contrast to these provisions, section 5(b) of the September Agreement states that:

The provisions of this Agreement, and any payment provided for hereunder, shall not reduce any amounts otherwise payable, or in any way diminish [Leberman's] existing rights, or rights which would accrue solely as a result of the passage of time, under any Benefit Plan, Incentive Plan or Securities Plan, employment agreement or other contract, plan or arrangement.

The introductory section and section 8(b) indicate that the September Agreement was intended to supersede the January Agreement, at least with respect to the amount of severance compensation to which Leberman was entitled. However, section 5(b) implies that the September Agreement did not affect any rights that Leberman had under the January Agreement. Because ambiguity exists as to the interpretation of the September Agreement and whether it superseded the January Agreement, the granting of summary judgment was improper. *See Gillaizeau*, 766 F.2d at 715; *Wards Co.*, 761 F.2d at 120; *Rothenberg*, 755 F.2d at 1019; *Schering Corp.*, 712 F.2d at 9.

Concerning Leberman's good faith in making the determination that he did not have to reduce the amount of the severance payment he was entitled to receive, we have held several times that "summary judgment is ordinarily inappropriate where

intent and state of mind are at issue." *Montana v. First Fed. Sav. and Loan Ass'n,* 869 F.2d 100, 103 (2d Cir.1989); *see Meiri v. Dacon,* 759 F.2d 989, 998 (2d Cir.), *cert. denied,* 474 U.S. 829, 106 S.Ct. 91, 88 L.Ed.2d 74 (1985); *Patrick v. LeFevre,* 745 F.2d 153, 159 (2d Cir.1984). "Summary judgment is notoriously inappropriate for determination of claims in which issues of intent, good faith and other subjective feelings play dominant roles." *Pfizer, Inc. v. Int'l Rectifier Corp.,* 538 F.2d 180, 185 (8th Cir.1976), *cert. denied,* 429 U.S. 1040, 97 S.Ct. 738, 50 L.Ed.2d 751 (1977). Therefore, the issue of good faith presents an additional triable issue, making summary judgment improper.

■ The determination whether Leberman acted in good faith in reaching his decision not to include the payments of restricted stock and performance units in calculating his severance payment, is governed by a subjective, rather than an objective standard. Leberman was specifically bound by the contract to act in good faith. In addition, a covenant of good faith and fair dealing is implied in every contract governed by New York law like the instant contract. *See Filner v. Shapiro,* 633 F.2d 139, 143 (2d Cir.1980). The covenant of good faith and fair dealing "precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement." *Id.* Any effort by Leberman to benefit by making a disingenuous determination that would create a windfall for him to the detriment of Blair would not be an act of good faith or fairness, and thus would violate the contract.

The record contains depositions of several tax experts, Eileen S. Silvers, a partner in the tax department of Paul, Weiss, Rifkind, Wharton & Garrison, Arthur H. Kroll, head of the tax and employee benefits department of Patterson, Belknap, Webb & Tyler and Yale D. Tauber, an experienced executive compensation practitioner and former head of the compensation and benefits department of LeBoeuf, Lamb, Leiby & MacRae, which state that Taggart's opinion had no reasonable basis and that they could not have reached an opinion such as Tag-

gart's in good faith. It appears that Taggart did not follow the procedures that other experts would have followed in reaching a decision not to include the award of performance units in the "lump sum severance payment" calculations. Here, Taggart did not consult the Unit Plan before reaching his initial opinion that the payments did not have to be included because they were not contingent on a change in control. The Unit Plan states that "[i]f there occurs an acquisition of control of [Blair] ... [the] Units outstanding shall vest immediately." The Performance Unit Certificate granted to Leberman specifically provided that "THIS CERTIFICATE AND THE TERMS AND CONDITIONS RELATING TO SUCH UNITS ARE SUBJECT IN THEIR ENTIRETY TO THE PROVISIONS OF THE JOHN BLAIR & COMPANY LONG–TERM INCENTIVE UNIT PLAN." Thus, Taggart should have known that he had to consult the Unit Plan to make an opinion in good faith. After reviewing the Performance Unit Certificate, Taggart could not have rendered a comprehensive and accurate opinion without obtaining a copy of and consulting the Unit Plan. His failure to do so could support an inference of an intention to create a windfall for Leberman by not including the value of the performance units in the severance payment calculations and thus avoiding payment of the excise tax. Taggart's lack of thoroughness or even his bad faith would not be determinative of the outcome here, however, unless Leberman knowingly contributed to that situation.

■ Regarding Leberman's good faith, we note that a person may rely on the advice of his or her attorney as long as the attorney's advice was solicited in good faith. *See United States v. Beech–Nut Nutrition Corp.,* 871 F.2d 1181, 1194 (2d Cir.1989). In an analogous situation in *Beech–Nut,* we held that there was "no inherent inconsistency" between a person "disclos[ing] all pertinent information in his possession to his attorney" and his "studious avoidance of gaining other pertinent information." *Id.* There appears to be no reason to question Leberman's initial good faith in soliciting Taggart's advice. How-

ever, we note that not all of the material that would be pertinent in making a decision in good faith was considered in this case. Taggart claims that he did not consult the Unit Plan because Leberman did not have a copy of the Unit Plan and thus he (Taggart) could not consult what he did not have. Leberman had a copy of the Performance Unit Certificate and must have been aware that it referred to the Unit Plan. His failure to provide this information to Taggart may have constituted "studious avoidance." Thus there is a genuine issue of material fact concerning whether Leberman acted in good faith in relying on advice when he knew or should have known that it was rendered without consulting all of the pertinent documents.

Also bearing on the good faith question is whatever reasonable inference of animus toward the new owners might be drawn from Leberman's having been fired. In the merger agreement between Blair and Reliance, Blair bound itself to limit severance agreements for its employees to "3 months' severance pay, ... plus one quarter of [the employee's] 1985 bonus in the event such employee is terminated prior to 6 months following Final FCC Approval." Despite these restrictions, Leberman granted his subordinates more generous severance payments. The employees were given one-half of their 1985 bonuses and the provisions were not limited to those terminations that occurred within six months of the change in control. From this a jury might conclude that Leberman harbored an animus against the incoming management, contributing to a bad faith determination on the severance payment question. The granting of summary judgment was error.

## CONCLUSION

Because there were material factual issues that should have been determined by a jury, the granting of summary judgment was erroneous. Accordingly, we reverse and remand the case to the district court for further proceedings.