CLIFFSTAR CORPORATION, Plaintiff,

v.

RIVERBEND PRODUCTS,
INC., Defendant.

No. CIV–89–344C.

United States District Court,
W.D. New York.

Nov. 15, 1990.

Phillips, Lytle, Hitchcock, Blaine & Huber (Edward S. Bloomberg, of counsel), Buffalo, N.Y., for plaintiff.

Jaeckle, Fleischmann & Mugel (John H. Stenger, of counsel), Buffalo, N.Y., for defendant.

CURTIN, District Judge.

## BACKGROUND

There are two disputes at issue in this case. Plaintiff Cliffstar Corporation ("Cliffstar") has moved for summary judgment on its claimed loss from partial delivery of an order of 3.2 million pounds of tomato paste. Defendant Riverbend Products, Inc. ("Riverbend") has cross-moved for summary judgment for payment on its delivery to Cliffstar of ten boxcars of lemon concentrate and also for payment on the tomato paste it actually delivered to Cliffstar.

## FACTS

### I. TOMATO PASTE CONTRACT

Riverbend processes and sells tomato paste and frozen citrus products. It has processing plants in Visalia, California and Yuma, Arizona. Item 28, at 1.

On July 14, 1988, Cliffstar ordered 3.2 million pounds of tomato paste from Riverbend. Item 1, Ex. A (Purchase Order No. 100011). In the same order, Cliffstar attempted to purchase an option on an additional 500,000 pounds of paste. Delivery of the paste was to be spread over the following year, until June 30, 1989. Riverbend accepted the order in writing on July 25, 1988. Item 1, Ex. B. Dale Seal, Riverbend's Director of Sales, rejected Cliffstar's requested option, however, writing: "at this time I am *unable* to give any options for any additional quantities due to the uncertainty of the incoming tonnage. I will keep you advised as the season progresses." *Id.*

Between October and December 1987, Riverbend had forecast sales for the 1988 tomato crop of approximately 53 million pounds of tomato paste. Item 32, at 4. In January and February of 1988, Riverbend's field department contracted with growers in Arizona and California to supply 170,000 tons of raw tomatoes. *Id.* at 5. The field department also projected purchasing additional tons of raw tomatoes on the spot market. *Id.* at 5–6. By combining firm contracts with spot buys, Riverbend planned to acquire sufficient numbers of raw tomatoes to support its sales forecast. Thereafter, Riverbend received oral and written orders for approximately 78 million pounds of tomato paste. *Id.* at 6. It remains disputed, however, whether Riverbend *accepted* these orders, and thus entered into contracts to supply this amount. *Compare id.* at 6 (citing Seal EBT at 24–26, Seal affidavit ¶ 10) *with* Item 28, at 2 (citing Seal EBT). *See also* Item 38, at 5–10 (arguing at length that Seal EBT and affidavit are not in contradiction).

About the time the Cliffstar–Riverbend contract was formed, and into the early fall, a shortage developed in the tomato crop in Arizona and California. Weather conditions in Arizona caused the crop, normally harvested over an eight to nine week stretch in June and July, to "bunch" (i.e., ripen at the same time), and thus last only five to six weeks from June 1 until mid-July. Item 32, at 7. The California crop experienced similar bunching, causing an accelerated harvest concluding in late September. *Id.* When the harvest is acceler-

ated in this fashion, processors cannot process all of the crop as it becomes ready and growers are forced to plow under some of the crop, thus creating a shortage.

The combined 1988 Arizona and California tomato harvest was about 8.45% less than early season estimates. However, Riverbend's contract growers delivered only 95–100,000 tons of the 170,000 tons of tomatoes Riverbend had contracted for, or about 56–58%. Item 32, at 6. Shortages developed in other parts of the country as well. *See* Item 34, Ex. RB–28. Riverbend became aware of the Arizona shortage by August 1, 1988, and of the California shortage in September, 1988, when its processing plants had completed canning the shortened supply.

Based on the shortages it was experiencing, Riverbend failed to deliver the 3.2 million pounds of paste. Instead, Riverbend chose to allocate its available supply among its customers. Riverbend first notified Cliffstar by letter of September 27, 1988, that all contracts would have to be reevaluated. Item 34, Ex. RB–5.[1] Riverbend notified Cliffstar by letter of November 21, 1988, that Cliffstar would be allocated one million pounds of paste. Item 34, Ex. RB–7. Riverbend did not allocate to each of its customers an equal percentage of their orders.

Between November 21, 1988, and January 23, 1989, Riverbend and Cliffstar engaged in oral and written settlement-modification negotiations. The parties dispute whether Cliffstar agreed to an allocation, or otherwise modified the initial contract with Riverbend. In any event, Riverbend delivered substantially less than one million pounds of paste to Cliffstar. Cliffstar demanded its full contract amount and this lawsuit ensued.

## II. LEMON CONCENTRATE CONTRACT

There are no disputed facts here. In July, 1988, Cliffstar ordered 127,817.89 pounds of lemon concentrate from Riverbend. The concentrate was delivered on December 29, 1988, and January 4, 1989. The total price of the concentrate was $249,244.88.

Cliffstar essentially admits these facts. *See* Item 7. It merely asserts in defense that it is entitled to offset the cost of these shipments against its claim for non-delivery of the tomato paste either under N.Y.U.C.C. Law § 2–717 (McKinney 1964) or under state law.

## DISCUSSION

### I. PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT ON THE TOMATO PASTE CONTRACT

Plaintiff Cliffstar has moved for summary judgment. In order to prevail on its motion, Cliffstar must show "that there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A material fact is one "that might affect the outcome of the suit under the governing law...." *Anderson v. Liberty Lobby*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The court "must resolve all ambiguities and draw all reasonable inferences in favor of the party defending against the motion." *Eastway Constr. Corp. v. City of New York*, 762 F.2d 243, 249 (2d Cir.1985), *cert. denied*, 484 U.S. 918, 108 S.Ct. 269, 98 L.Ed.2d 226 (1987). "Uncertainty as to the true state of any material fact defeats the motion." *United States v. One Tintoretto Painting*, 691

---

**1.** This letter, from Dale Seal at Riverbend to David Diodato at Cliffstar, said in part:

We have been forced to re-evaluate all contracts and shipping schedules due to the 1988 short-crop. We fully expected to fulfill all pre-season and post-season contracts, but unfortunately our two plants produced only a percentage of our original field projections

due to force majeure and other factors beyond our control.

We will do our very best to provide you with updated information concerning the tomato paste situation and the disposition of the remaining product.

Item 34, Ex. RB–5.

F.2d 603, 606 (2d Cir.1982) (citation omitted).

### A. *N.Y.U.C.C. § 2–615*

Plaintiff bases its cause of action on the fact that (1) it ordered 3.2 million pounds of tomato paste on July 14, 1988 for delivery over the next year, (2) this order was accepted by defendant on July 25, 1988, and (3) the tomato paste was not forthcoming. Riverbend defends under N.Y.U.C.C. Law § 2–615 (McKinney 1964), which provides:

> Except so far as a seller may have assumed a greater obligation and subject to the preceding section on substituted performance:
>
> (a) Delay in delivery or non-delivery in whole or in part by a seller who complies with paragraphs (b) and (c) is not a breach of his duty under a contract for sale if performance as agreed has been made impracticable *by the occurrence of a contingency the non-occurrence of which was a basic assumption on which the contract was made*
> . . . .
>
> (b) Where the causes mentioned in paragraph (a) affect only a part of the seller's capacity to perform, he must allocate production and deliveries among his customers but may at his option include regular customers not then under contract as well as his own requirements for further manufacture. *He may so allocate in any manner which is fair and reasonable.*
>
> (c) The seller must notify the buyer *seasonably* that there will be delay or non-delivery *and,* when allocation is required under paragraph (b), of the estimated quota thus made available for the buyer.

(emphasis added). Summary judgment largely hinges on whether defendant has complied with this section.

■ To prevail under this defense, Riverbend must establish that: "(1) a contingency has occurred; (2) the contingency has made performance impracticable; and (3) the nonoccurrence of that contingency was a basic assumption upon which the contract was made." *Waldinger Corp. v. CRS Group Eng'rs, Inc.,* 775 F.2d 781, 786 (7th Cir.1985). *See also Louisiana Power & Light Co. v. Allegheny Ludlum Indus.,* 517 F.Supp. 1319, 1323 (E.D.La.1981). In addition, Riverbend must show that its allocation to Cliffstar was "fair and reasonable," N.Y.U.C.C. § 2–615(b), and that it "seasonably" notified Cliffstar of its need to allocate and the amount Cliffstar was to receive under this allocation. N.Y.U.C.C. § 2–615(c). Riverbend also has the burden of proof on each element of this defense. *Louisiana Power,* 517 F.Supp. at 1324; *Eastern Air Lines v. Gulf Oil Corp.,* 415 F.Supp. 429, 438 (S.D.Fla.1975).

### 1. *Was the 1988 Tomato Crop Shortage Foreseeable?*

■ Under § 2–615, the first question is whether the 1988 tomato crop shortage was "a contingency the non-occurrence of which was a basic assumption on which the contract was made." N.Y.U.C.C. § 2–615(a). This question, in turn, hinges on whether the crop shortage was foreseeable at the time the contract was made. *See Waldinger Corp.,* 775 F.2d at 786. "If a contingency is foreseeable, it and its consequences are taken outside the scope of U.C.C. § 2–615, because the party disadvantaged by fruition of the contingency might have protected himself in his contract." *Eastern Air Lines,* 415 F.Supp. at 441. *See also Waldinger Corp.,* 775 F.2d at 786–87; 4 R. Anderson, UNIFORM COMMERCIAL CODE § 2–615:16 (1983 and Supp.1989). However, non-foreseeability is not an absolute requirement. "After all, as Williston has said, practically any occurrence can be foreseen but whether the foreseeability is sufficient to render unacceptable the defense of impossibility is 'one of degree'...." *Opera Co. of Boston v. Wolf Trap Foundation for the Performing Arts,* 817 F.2d 1094, 1101–02 (4th Cir. 1987). *See also Transatlantic Fin. Corp. v. United States,* 363 F.2d 312, 318 (D.C. Cir.1966).

Plaintiff argues that Mr. Seal at Riverbend was aware of the bunching of the 1988 Arizona tomato crop as early as June 1, 1988, or in any event no later than mid-

July when it had been fully harvested. Plaintiff further argues that Mr. Seal knew of the shortfall in the California crop at the end of July, 1988. Plaintiff also points out that, in his letter accepting Cliffstar's 3.2 million pound order, Mr. Seal advised Cliffstar that "the uncertainty of the incoming crop" prevented him from giving Cliffstar an option for additional tomato paste. Item 1, Ex. B. Thus, plaintiff claims, Riverbend could have foreseen the crop shortage by July 25, 1988, when it confirmed Cliffstar's order. Riverbend's failure to protect itself against this contingency bars application of § 2–615, plaintiff concludes.

Defendant admits that on July 25, 1988, the Arizona harvest had just concluded, but argues Mr. Seal was not aware that Riverbend's Arizona processing plant had processed only 50% of its expected tonnage until August 1, 1988. Riverbend also notes that the much larger California harvest did not conclude until mid-to-late *September.* Until that time, Riverbend remained hopeful that the California harvest would make up the shortfall caused by the bunching in the Arizona crop. *See* Item 34, Ex. A at 129–30 (Seal EBT). Indeed, the Food Institute Report ("FIR") had *increased* its estimate of California production from 6.9 million tons on March 26, 1988 to 7.1 million tons by July 16, 1988, and held to this production estimate as late as September 10, 1988. *See* Item 34, Ex. RB–31. It was not until its issue of September 17, 1988, that the FIR noted that "[h]ot temperatures in California have reduced crop prospects in that state." *Id.*

Under these facts, the court finds that there is a genuine issue of material fact as to whether the crop shortage was foreseeable at the time the contract was made. *See Alimenta (U.S.A.), Inc. v. Cargill, Inc.,* 861 F.2d 650, 653–54 (11th Cir.1988) (holding foreseeability of peanut crop shortage to be jury question).

## 2. Was Riverbend's Failure to Perform Caused by the Shortage in the 1988 Tomato Crop?

■ Plaintiff's second argument is that Riverbend's failure to deliver the tomato paste was not caused by the 1988 crop shortfall but by oversale of its contracted-for supply. "To successfully assert the affirmative defense of commercial impracticability, the party must show that the unforeseen event upon which excuse is predicated is due to factors beyond the party's control." *Roth Steel Products v. Sharon Steel Corp.,* 705 F.2d 134, 149–50 (6th Cir. 1983). Defendant may not have caused the event that prevents performance. *National Iranian Oil Co. v. Ashland Oil Co.,* 817 F.2d 326, 333 (5th Cir.1987); *Nissho–Iwai Co. v. Occidental Crude Sales, Inc.,* 729 F.2d 1530, 1540 (5th Cir.1984). In *Roth Steel,* the court barred an impracticability defense where the "record indicate[d] that Sharon continued to accept an unprecedented amount of purchase orders during the first half of 1973 even though it knew that raw materials were in short supply." *Roth Steel,* 705 F.2d at 150.

Both parties agree that by early 1988, Riverbend had projected sales of approximately 53 million pounds of tomato paste. Riverbend then contracted with local growers in Arizona and California to receive 170,000 tons of raw tomatoes. Riverbend also planned to purchase an additional 30,000 tons of raw tomatoes on the spot market. Thereafter, Riverbend received *orders* for approximately 78 million pounds of paste. These facts are not disputed.

The dispute between the parties centers on the validity of Mr. Seal's assertion in his May 31, 1990 affidavit that "although I received orders for approximately 78 million pounds of tomato paste, I did *not* enter into contracts to sell that amount." Item 34, ¶ 24. Defendant devotes five pages of its brief arguing that this assertion does not contradict Mr. Seal's deposition testimony.[2] Item 38, at 5–10. Defendant ar-

---

2. Mr. Seal, in his deposition of September 21, 1989, stated:

Mr. Seal: The discrepancy between the 78,300,000 pounds, and our forecasted tonnage of 53 million pounds was the difference be-

tween spot-buy tonnage, which we felt was going to be available, finished product which we could purchase from other processors, such as Ragu, DelMonte, which was pur-

gues first that Item 34, Ex. RB–46, contains only a list of *purchase orders*, not contracts, for 1988 tomato paste received by Riverbend. Defendant further argues that Mr. Seal, a layperson, meant "orders" when he said "contract" during his deposition testimony.

> Further, many of the orders [we]re standing orders from year to year pursuant to which various buyers request[ed] Riverbend to ship as much tomato product as possible up to a certain maximum quantity, and then during the year that figure [would be] adjusted by both parties depending upon price and availability of product.

Item 34, ¶ 24 (Seal affidavit).

Plaintiff argues that Mr. Seal's testimony, and the purchase orders attached as Ex. RB–46 speak for themselves. Plaintiff further argues that Mr. Seal should not be able to raise an issue of fact merely by contradicting his prior testimony. *See Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 578 (2d Cir.1969); *United States v. Dercacz*, 530 F.Supp. 1348, 1351 (E.D.N.Y.1982); *Miller v. Int'l Tel. and Tel. Co.*, 755 F.2d 20, 24 (2d Cir.), *cert. denied*, 474 U.S. 851, 106 S.Ct. 148, 88 L.Ed.2d 122 (1985); 10A C. Wright, A. Miller & M. Kane, FEDERAL PRACTICE AND PROCEDURE § 2726 (1983 & Supp. 1990). In *Perma Research*, the court stated:

> If a party who has been examined at length on deposition could raise an issue of fact simply by submitting an affidavit contradicting his own prior testimony, this would greatly diminish the utility of summary judgment for screening out sham issues of fact.

*Perma Research*, 410 F.2d at 578. "On the other hand, if the witness' answers in the deposition are not that clear or the questions are not that unambiguous, a later filed affidavit may indeed create a genuine issue by supplying additional facts." FEDERAL PRACTICE AND PROCEDURE § 2726 (Supp.1990) (citing three cases); *Dercacz*, 530 F.Supp. at 1351 ("Defendant failed to submit any *supporting facts* which suggest that the former testimony should be discredited; therefore, the Court credits defendant's prior *unambiguous* statements.") (emphasis added).

■ After thorough examination, the court concludes that Mr. Seal's testimony and the attached documents are not without some ambiguity. Moreover, the question to be decided is whether Riverbend's shortages were the result of factors outside its control. It must be noted that, according to Item 34, Ex. RB–37, Riverbend was only able to deliver 41,924,097 pounds of 1988 tomato paste through May 1, 1989. Yet Riverbend had contracted to receive a quantity of raw tomatoes sufficient to process approximately 53 million pounds of paste. And it must be taken as true for purposes of this motion that the farmers Riverbend had contracted with were able to provide only 56–58% of this raw tomato supply. These facts thus raise a material issue of fact whether the tomato crop shortage forced Riverbend to allocate its available supply of tomato paste under § 2–615.

### 3. Was Riverbend's Allocation "Fair and Reasonable"?

■ Plaintiff's third argument is that Riverbend has failed under § 2–615(b) to make a "fair and reasonable" allocation of the shortfall. Plaintiff admits that in mak-

---

chased in the past, as well as imports which we planned on purchasing.

> Mr. Bloomberg: All right. You told me that your sales forecast was to sell 53 million pounds of paste?
>
> Mr. Seal: Correct.
>
> Mr. Bloomberg: And yet you took orders to sell 78 million pounds of paste?
>
> Mr. Seal: Yes.
>
> Mr. Bloomberg: And is it your testimony then that you thought Riverbend would be able to buy finished products, imports and

spot-buys sufficient to make up the 25 million—

> Mr. Seal: Yes.
>
> Mr. Bloomberg: —pounds of paste difference?
>
> Mr. Seal: Yes.
>
> Mr. Bloomberg: Certain documents are attached as tab 46. Are those all of the written documents relating to purchase orders for product out of the '88 tomato crop?
>
> Mr. Seal: Yes. I might rephrase. These are what we had contract for sale.

ing its allocation Riverbend considered such factors as customer loyalty, past performance, needs, the relationship between Riverbend and the customer, and Riverbend's projections of potential future sales to the customer. Item 28, at 12. Plaintiff argues, however, that Riverbend did not treat it *equally*. *See Terry v. Atlantic Richfield Co.*, 72 Cal.App.3d 962, 140 Cal. Rptr. 510, 513 (1977). Riverbend does not contest this.[3] Riverbend argues instead that § 2–615 does not require equal allocation. *See* N.Y.U.C.C. § 2–615 comment 11 (1964) ("this section seeks to leave every reasonable business leeway to the seller"). *See also Intermar, Inc. v. Atlantic Richfield Co.*, 364 F.Supp. 82, 99 (E.D.Pa.1973) ("The fact that plaintiff, under the allocation formula, receives less than its marketing needs is the result of its lack of sales history in 1972 rather than the result of any arbitrary and discriminatory conduct by the defendant...."); J. White & R. Summers, UNIFORM COMMERCIAL CODE § 3–9 (1988).[4]

The court finds that the question whether Riverbend's allocation to Cliffstar was "fair and reasonable" is one of fact to be decided by the jury.[5] *See Alimenta*, 861 F.2d at 654; *Terry*, 140 Cal.Rptr. at 512 ("Except where there is no room for a reasonable difference of opinion, the reasonableness of an act or omission is a question of fact, that is, an issue which should be decided by a jury and not on a summary

judgment motion."); 3 W. Hawkland, UNIFORM COMMERCIAL CODE SERIES § 2–615:13.

## 4. Was Cliffstar "Seasonably" Notified of the Shortage and Its Allocation Quota?

Finally, plaintiff argues that Riverbend failed to "seasonably" notify it of its allocation amount. N.Y.U.C.C. § 2–615(c). Riverbend sent a letter on September 27, 1988 informing Cliffstar they were being forced by the crop shortage to reevaluate all contracts.[6] Riverbend did not, however, inform Cliffstar of its allocation quota at that time. This did not take place formally by letter until November 21, 1988. Item 34, Ex. RB–7.

Although plaintiff is correct that § 2–615(c) requires notification not only of the facts of delay or non-delivery but also, where allocation is contemplated, of the estimated quota that will be delivered to buyer, as a practical matter, a seller may not be able to provide this notice instantaneously. As one hornbook notes:

In any given case, however, it may be difficult to know whether the excusing contingency will merely cause a delay in delivery or absolutely preclude it. In that circumstance the seller faces a problem as to what kind of notice he must give and whether and when he should begin a plan of allocation. The seller

---

**3.** Defendant admits that, whereas Cliffstar was allocated approximately 31% of its original order, other Riverbend customers received 85% or even 100% of their orders. *See* Item 34, Ex. RB–37.

**4.** Professors White and Summers offer a lengthy note about the factors that may be properly considered in a fair allocation:

One should note that a direction to allocate pro rata is far from an explicit and rigid set of allocation rules. Seller may choose to prorate based upon historic deliveries, historic contract amounts, current needs, current contract amounts and possibly other contract grounds. By choosing one or another scheme to establish his proration, the seller may be able to favor one set of customers over another to a considerable extent. Moreover if we allow further deviations in the pro rata scheme based upon appropriate priority rules either because of the social utility of certain

uses or because of the more serious injuries that some buyers would suffer if they did not receive more than a pro rata share, we leave the seller with a great deal of flexibility. We believe that the seller should have considerable flexibility and that courts will not often improve things by putting their own oar in. The seller's selfish long-term interest in maintaining a cadre of customers will usually sufficiently induce him to treat his customers as he should.
UNIFORM COMMERCIAL CODE § 3–9, at 182.

**5.** It must be noted that Cliffstar was allocated almost as much paste as it had received the prior year. *See* Item 34, Ex. RB–7 (Cliffstar letter of November 4, 1988, to Riverbend listing receipts of 1987 orders for tomato paste at 1,079,323 pounds.)

**6.** *See supra* note 1 and accompanying text (quoting text of letter).

should be protected if he gives seasonable notice of the delay and indicates in good faith that he is uncertain as to whether the delay will ripen into nondelivery and that he will keep the buyer informed of developments as they unfold. Of course, the seller must, thereafter, make good on his promise to keep the buyer informed, and as soon as the seller knows that nondelivery will occur he must notify the buyer of this fact.

3 W. Hawkland, UNIFORM COMMERCIAL CODE SERIES § 2–615:13.

In this case, Mr. Seal at Riverbend was not fully aware of the extent of the tomato crop shortage until mid-to-late September. A short time later, Mr. Seal informed Cliffstar that it would have difficulty filling the order completely. Thereafter, Riverbend was in regular contact with Cliffstar discussing the tomato paste contract. Although its final, formal notification of the amount Cliffstar would be allocated did not come until November 21, 1988, the court does not agree with plaintiff that, as a matter of law, this notice was unseasonable. *See Alimenta*, 861 F.2d at 654.

### B. *Was the Contract Modified?*

 Riverbend argues in the alternative that, should § 2–615 not apply, it is not liable because plaintiff agreed to a modification of the original contract. Plaintiff counters that, although Mr. Seal at Riverbend and Mr. Diodato at Cliffstar engaged in significant ongoing settlement-modification negotiations, *see* Item 34, Exs. RB–7 to RB–28, no agreement was ever reached *in writing* between the parties. *See* N.Y.U. C.C. Law §§ 2–201, 2–209(3) (McKinney 1964).

The court agrees with plaintiff that no binding modification was ever reduced to writing between the parties. However, under N.Y.U.C.C. § 2–209(4), "[a]lthough an attempt at modification or rescission does not satisfy the requirements of subsection (2) or (3) [that there be a writing,] it can operate as a waiver." A party may waive

its rights under a contract either through its conduct or by its words. *Federal Express Corp. v. Pan Am. World Airways*, 623 F.2d 1297, 1302 (8th Cir.1980) (applying New York law). There remains a genuine issue of fact as to whether plaintiff Cliffstar waived its rights under the original contract.

Accordingly, for all of the foregoing reasons, the motion for summary judgment on behalf of Cliffstar is denied.

## II. CROSS CLAIM FOR PAYMENT ON DELIVERY OF LEMON CONCENTRATE AND PARTIAL DELIVERY OF THE TOMATO PASTE CONTRACT

There are no genuine facts in dispute here. In its cross-complaint, Item 6, Riverbend alleges that in July, 1988, Cliffstar agreed to purchase and Riverbend agreed to sell 127,817.89 pounds of lemon concentrate. The deliveries were made on December 29, 1988, and January 4, 1989. The price for the concentrate was $249,244.88. Cliffstar essentially admits these facts in its reply, Item 7, ¶¶ 4–6. Most importantly, however, Cliffstar ("plaintiff")

> admits that plaintiff has refused to pay for said deliveries but alleges that plaintiff is not obligated to pay for said deliveries because plaintiff has the right to set off the amount of the damages suffered by plaintiff as set forth in plaintiff's complaint.

Item 7, ¶ 7.

Cliffstar also admits that Riverbend delivered four shipments of tomato paste.[7] Riverbend's alleged cost for these deliveries was $58,456.38. Cliffstar admits it has refused to pay for these deliveries, but alleges it is not obligated to do so because it may set off these costs against its initial claim. Item 7, ¶ 14.

### A. *N.Y.U.C.C. § 2–717*

Cliffstar first argues that it is entitled to offset Riverbend's counterclaim against its initial claim under N.Y.U.C.C. Law § 2–717 (McKinney 1964). This section provides:

---

7. The deliveries were on December 5, 1988, December 22, 1988, December 27, 1988, and January 9, 1989.

The buyer on notifying the seller of his intention to do so may deduct all or any part of the damages resulting from any breach of the contract from any part of the price still due *under the same contract.*

N.Y.U.C.C. § 2–717 (emphasis added). The official comment to this section emphasizes that "[t]o bring this provision into application the breach involved *must be of the same contract* under which the price in question is claimed to have been earned." N.Y.U.C.C. § 2–717, comment 1 (emphasis added).

There is no doubt that Cliffstar is entitled to the benefits of this section with respect to the four shipments of tomato paste made by Riverbend in late 1988 and early 1989. By Riverbend's own admission, these deliveries were part of the contract for 3.2 million pounds of tomato paste which forms the central dispute of this case. *See* Item 6, ¶¶ 10–12.

■ Cliffstar is not, however, entitled under § 2–717 to offset the price for its order of lemon concentrate from damages claimed on the tomato paste contract because these two disputes clearly involve separate contracts. *Sharp Elec. Corp. v. Arkin–Medo, Inc.*, 86 A.D.2d 817, 452 N.Y. S.2d 589, 590 (1982), *aff'd*, 58 N.Y.2d 986, 461 N.Y.S.2d 1014, 448 N.E.2d 799 (1983); *Sunbeam Corp. v. Morris Distrib. Co.*, 55 A.D.2d 722, 389 N.Y.S.2d 173, 174 (1976); *Hellendall Distrib., Inc. v. S.B. Thomas, Inc.*, 559 F.Supp. 573, 574–75 (E.D.Pa. 1983), *aff'd*, 755 F.2d 920 (3rd Cir.1985); *Artmark Assoc., Inc. v. Allied Tube & Conduit Corp.*, 32 U.C.C. Rep't Serv. 454, 456 (N.D.Ill.1981).

Cliffstar argues that the order for tomato paste (P.O. No. 100011) and lemon concentrate (P.O. No. 100028) were part of a single underlying agreement. But the mere fact that these two purchases were negotiated at about the same time, and that Cliffstar sought to use its leverage in purchasing lemon concentrate to obtain the best price for tomato paste, *see* Item 21 (Diodato affidavit), does not make these two orders part of the same contract. As Riverbend notes:

> the lemon concentrate agreement and the tomato paste agreement were reached on different dates; their terms are set forth within two separate and distinct documents; neither agreement refers to the other; there are no facts indicating that the terms of one are related to and/or are conditional upon the other; and Cliffstar's Complaint itself treated the tomato paste contract as separate and distinct from the lemon concentrate contract....

Item 38, at 1–2. The court finds these arguments compelling.[8]

### B. *State Law*

Cliffstar argues in the alternative that even if it is not entitled to offset under N.Y.U.C.C. § 2–717, it is entitled to do so under state law.

■ As an initial matter, Cliffstar is correct in noting that the non-application of § 2–717 does not *prohibit* a frustrated buyer from seeking a set off of its losses from one contract against the price due seller on another contract, where state law permits this. *See* 3 W. Hawkland, UNIFORM COMMERCIAL CODE SERIES § 2–717:03; 4 R. Anderson, UNIFORM COMMERCIAL CODE § 2–717:4, 5. The cases cited by Cliffstar, however, do not hold that a buyer is entitled to this set off as a matter of right.[9]

On the contrary, in a long line of cases, New York courts have granted summary judgment where a counterclaim is not so interwoven with the main claim that entry

8. The cases cited by Cliffstar do not alter this conclusion. The first case, *Created Gemstones, Inc. v. Union Carbide Corp.*, 47 N.Y.2d 250, 417 N.Y.S.2d 905, 907, 391 N.E.2d 987, 989–90 (1979), involved a dispute over a single contract. In the second case, *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1559–60 (2d Cir.1989), the court denied summary judgment because a party's intent and state of mind were in issue. There is no such issue in this case.

9. Cliffstar cites five cases, plus N.Y.Civ.Prac.L. & R. § 3019 (McKinney 1974) in support of its motion. Three of these cases involved bankers' liens which are not applicable to the facts at bar: *Studley v. Boylston Nat'l Bank*, 229 U.S. 523, 527–28, 33 S.Ct. 806, 808, 57 L.Ed. 1313 (1913); *Katz v. First Nat'l Bank of Glen Head*, 568 F.2d 964, 967–68 (2d Cir.1977), *cert. denied*, 434 U.S. 1069, 98 S.Ct. 1250, 55 L.Ed.2d 771 (1978); *Marine Midland Bank—New York v.*

of judgment should be withheld. *See Green Acres Assoc. v. Pergament Distrib., Inc.*, 143 A.D.2d 974, 533 N.Y.S.2d 583, 584 (1988) (awarding summary judgment where "defendants explicitly conceded their liability for the outstanding debts"); *P.S. Griswold Co. v. Cortland Glass Co.*, 138 A.D.2d 869, 525 N.Y.S.2d 973, 974–75 (Sup. Ct.1988) (summary judgment granted for subcontractor on completed work); *Rivertone Corp. v. General Thermoforming Corp.*, 90 A.D.2d 906, 456 N.Y.S.2d 869, 870 (Sup.Ct.1982) (plaintiff admitted outstanding debt to defendant); *Boro Lumber Co. v. S & S Corrugated Paper Mach. Co.*, 85 A.D.2d 675, 445 N.Y.S.2d 519, 520 (Sup. Ct.1981) (summary judgment granted on delivered building materials). This relief has been stayed, however, where there is "some articulable reason for concluding that [defendant] is financially unstable and might be unable to satisfy any judgment eventually secured by the [plaintiff]." *Elda Dev. Corp. v. Wall*, 101 A.D.2d 1000, 476 N.Y.S.2d 690, 690–91 (1984). *See also P.S. Griswold Co.*, 525 N.Y.S.2d at 975.

In the present case, the court finds that the tomato paste contract and the lemon concentrate contract are not so interwoven so as to preclude summary judgment on the latter. Therefore, plaintiff's motion for summary judgment is denied on the present record and defendant Riverbend's motion for summary judgment on the lemon concentrate contract is granted. The motion for summary judgment on the tomato paste, which was actually delivered to Cliffstar, is also denied. Defendant shall prepare a proposed partial judgment in accordance with this order upon five days notice to plaintiff.

So ordered.

*Graybar Elec. Co.*, 41 N.Y.2d 703, 395 N.Y.S.2d 403, 407, 363 N.E.2d 1139, 1142–43 (1977). Another case involved stock placed in escrow and is also not applicable: *Clarkson Co. Ltd. v. Shaheen*, 533 F.Supp. 905 (S.D.N.Y.1982). The fifth case, *Rochester–Genesee Regional Transp. Dist., Inc. v. Trans World Airlines*, 86 Misc.2d 1011, 383 N.Y.S.2d 856, 857 (Sup.Ct.1976), merely stands for the principle that a set off is a type of counterclaim, and need not arise from the same contract to be raised as a defense. Similarly, the N.Y. Civil Practice Laws & Rules permit a counterclaim on "*any* cause of action." N.Y. Civ.Prac.L. & R. § 3019(a). This does not mean such a claim need be granted.