**NATIONAL UTILITY SERVICE, INC., a New Jersey corporation, successor by merger to National Utility Service, Inc., a New York Corporation, Plaintiff,**

v.

**BLUE CIRCLE, INC., an Alabama corporation, successor by merger to Blue Circle Atlantic, Inc., formerly known as Atlantic Cement Company, Inc., doing business as Blue Circle Cement, Inc., Defendant.**

Civ. No. 88–CV–409.

United States District Court, N.D. New York.

March 10, 1992.

Kurzman, Karelsen & Frank, New York City (Michael P. Graff, Henry L. Saurborn, Jr., of counsel), for plaintiff.

Tofel, Berelson & Saxl, P.C., New York City (Lawrence E. Tofel, of counsel), for defendant.

## MEMORANDUM—DECISION AND ORDER

SMITH, United States Magistrate Judge.

In accordance with the provisions of 28 U.S.C. § 636(c) and Fed.R.Civ.P. 73, the parties have voluntarily waived their rights to proceed before a United States District Judge and have consented to have a United States Magistrate Judge conduct any and all further proceedings in this case including the trial and entry of a final judgment. The parties have also agreed that any appeal from the judgment of this Court shall be taken to the United States Court of Appeals for the Second Circuit in accordance with 28 U.S.C. § 636(c) and Fed. R.Civ.P. 73(c). The action was thus referred to the undersigned by Chief Judge Neal P. McCurn by his Order of January 8, 1991. A four consecutive day bench trial commenced on September 30, 1991, following which the parties were directed to provide written post-trial briefs in lieu of closing arguments.

In this diversity action, plaintiff, a New Jersey corporation, seeks damages from defendant, an Alabama corporation, for work, labor and services, unjust enrichment, and specific performance of a contract. The jurisdiction of this court is stipulated.

## FINDINGS OF FACT

National Utility Service, Inc., a New Jersey corporation, is the successor in interest to a New York corporation of the same name as a result of a January 1, 1988, merger. Blue Circle Inc., an Alabama corporation, is the successor in interest to Blue Circle Atlantic Inc. f/k/a Atlantic Cement Company, Inc., a Delaware corporation as a result of a 1991 merger. In September 1982, National Utility Service, Inc., the New York corporation, and Atlantic Cement Company, Inc., the Delaware corporation, executed a contract prepared by plaintiff which provided generally that plaintiff would review defendant's energy costs and make recommendations concerning savings which, if implemented by defendant, would obligate defendant to pay plaintiff 50 percent of the savings. The contract also called for a $6,500 service fee

payable at the time of signing to be offset against the amount payable to plaintiff if savings were realized. In accordance with the terms of that contract, defendant paid the service fee and on October 22, 1982, sent one year's utility bills to plaintiff for analysis. Following its review of these utility bills, plaintiff sent an Initial Analysis Report to the defendant on March 7, 1983. This was followed by plaintiff's letter of December 6, 1983, to Lawrence Leonard, Vice–President and Treasurer of defendant enclosing a Rate Analysis Report recommending that defendant arrange to receive electrical service at its Ravena, New York cement manufacturing plant under a different rate schedule, Service classification 3–B.

Prior to this time, the defendant had been receiving electrical service from the Niagara Mohawk Power Company ("NiMo") under rate schedule 3–A which provided for firm uninterruptible electric service. Although interruptible service had been available since October, 1982, defendant had either never been advised of its availability or, if so advised, had not considered its use. Plaintiff, in recommending that defendant now change service classifications to receive electrical service under 3–B pointed out that this change would result in substantial savings. It further suggested that defendant send a letter to NiMo in a form suggested by the plaintiff on defendant's letterhead asking for a comparison of the two rates.

On December 28, 1983, this recommendation was forwarded by Leonard to E.G. Irwin, defendant's Vice–President of Operations at the Ravena plant, for review. In turn, on February 9, 1984, Irwin forwarded the recommendation to Alfred Staub, defendant's Chief Engineer at Ravena for investigation. This referral resulted in a "Preliminary report" to Irwin from Staub on February 13, 1984, suggesting that savings were possible only with substantial modifications to defendant's substation and power distribution and upon acceptance of power interruptions to grinding mills. Staub also noted that he had contacted NiMo and General Electric for details as to necessary modifications and the cost thereof. Staub subsequently met with representatives of NiMo and General Electric on March 12, 1984.

Meanwhile, having heard nothing from defendant, plaintiff wrote to defendant on January 30, 1984 and March 8, 1984, inquiring as to the status of its recommendation and any action taken by defendant with respect thereto. In both letters, plaintiff pointed out that it was essential that defendant obtain feedback from the utility company involved and keep plaintiff advised so as to maximize savings. Defendant did not respond to either letter nor to a subsequent speed letter of May 9, 1984, again requesting the status of the recommendation made by plaintiff. Meanwhile, representatives of defendant met with NiMo and General Electric, as described in an internal memorandum dated March 14, 1984, "to obtain interpretation of rate 3–B (interruptible service)". During that meeting it was decided that preliminary engineering, cost and benefit analysis would be worked out by March 30 and that General Electric would assist in a consideration of upgrading and modernizing the substation. It was also determined that further discussions with NiMo should be held concerning interruptible power and that defendant's production and sales departments should review this proposal carefully.

While defendant points to the testimony of Leonard asserting that a decision was made "probably within two months after the recommendation" and that plaintiff was notified in periodic telephone conversations that the recommendation was not acceptable, I do not credit this testimony which is extremely vague and tentative. Similarly, the record does not support defendant's argument that well before November 28, 1984, when plaintiff telephoned Leonard, again seeking a response as to the recommendation, the plaintiff had been advised that its recommendation would not be accepted. To the contrary, the defendant still did not reject the recommendation and continued to advise plaintiff that interruptible service was "practical" as late as November 28, 1984, as documented by an Internal Memo of that date reflecting a tele-

phone conversation between plaintiff's H. Mills and defendant's Lawrence Leonard. By plaintiff's letter of November 30, 1984, and the enclosed report, it is clear that plaintiff had still not been advised that defendant could not accept the recommendation. As late as February 28, 1985, plaintiff, after failing to reach defendant by telephone, by letter again sought information from defendant concerning its recommendation for the change of service to interruptible rate 3–B. Only thereafter and as a result of that letter did defendant by letter of March 5, 1985, advise plaintiff that its recommendation could not be accepted. Significantly, that letter stated that following plaintiff's December 28, 1983 [1] recommendation, defendant's engineering staff investigated and found it unacceptable. It does not state that NUS was so advised.

Meanwhile, on October 29, 1984, NiMo notified defendant by letter of a newly created rate, 3–C, which defendant found acceptable and implemented at considerable savings. This rate provided both firm and interruptible power but did not require the construction of a separate substation. Plaintiff contends, and I agree, that but for the meeting of March 12, 1984, of defendant's representatives with those of NiMo, the latter would not have been aware that defendant would even consider switching to interruptible power. No consideration had been given by defendant to the use of interruptible power prior to the contract with plaintiff and plaintiff's recommendation. Plaintiff is thus entitled to receive the benefits of its recommendation.

CONCLUSIONS OF LAW

■ The terms of the agreement at issue are clear and unambiguous. Paragraph three of the agreement between the parties in September 1982 provided that defendant "will promptly forward to you all information pertaining to your recommendations for your evaluation and further advice." Defendant did not do so and, by its failure, has neither acted in good faith nor complied with that term of the agreement. It provided 12–months worth of utility bills

followed by those for a few later months and did nothing further, not even responding to frequent requests by the plaintiff for information concerning that recommendation. It totally failed, therefore, to comply with its contractual obligation to forward information pertaining to its recommendation despite several opportunities and reminders of its obligation to do so. It cannot now claim that it told plaintiff that its recommendation would not be accepted.

By contrast, plaintiff performed its entire obligation under the agreement by analyzing the utility bills and making a recommendation that defendant adopt interruptible service. Any further performance was frustrated by defendant's lack of cooperation. When that recommendation was made, 3–B was the only rate available for interruptible service. Defendant acted upon that recommendation by meeting with representatives of NiMo and General Electric but failed to advise plaintiff of the results of those meetings. Had it done so, plaintiff might well have further studied its recommendation and conceivably might have recommended 3–C when it became available. However, the recommendation for interruptible service, be it called 3–B or 3–C, was clearly a concept which defendant had not considered. Had plaintiff amended its suggestion to encourage defendant to switch to rate 3–C when it became aware that NiMo was offering such a rate, there is no doubt but that plaintiff, had defendant switched, would have been entitled to the relief sought in this litigation. That it did not, however, does not reduce its right to recover.

■ A covenant of good faith and fair dealing is implied in every contract governed by New York law. *Leberman v. John Blair & Co.*, 880 F.2d 1555, 1560 (2d Cir.1989) (citing *Filner v. Shapiro*, 633 F.2d 139, 143 (2d Cir.1980)). That covenant precludes each party from engaging in conduct that will deprive the other party of the benefits of their agreement. *Id.* This describes exactly what has occurred here in that defendant has clearly not dealt fairly

1. In fact, plaintiff's recommendation was contained in a letter of December 6, 1983.

with the plaintiff and has not acted in good faith. Defendant neither rejected the recommendation nor cooperated by providing the information required by the agreement and cannot be permitted to preclude plaintiff's right to compensation under the contract.

■ I, therefore, find that defendant has breached its agreement with plaintiff and, as a result and to prevent unjust enrichment of defendant, plaintiff is entitled to recover one-half of the total savings realized by defendant between December 1984 and March 1988 at which point the instant action was commenced. That amount is $1,093,469.30, of which plaintiff is entitled to recover one half after deduction of the prepaid service fee of $6,500 for a net recovery of $543,484.65 with interest.[2] Under New York law, pre-judgment interest should begin to run from the earliest ascertainable date the cause of action existed. N.Y.Civ.Prac.L. § 5001(b) ("CPLR"). In the case of anticipatory repudiation on payments due over a period of time, this language has been construed to mean a reasonable intermediate date during the period in which payments due would have been made. *Esquire Radio & Electronics v. Montgomery Ward*, 804 F.2d 787, 796 (2d Cir.1986) (citing *Decor By Nikkei International Inc. v. Federal Republic of Nigeria and Central Bank of Nigeria*, 497 F.Supp. 893, 912 (S.D.N.Y.1980), *aff'd*, 647 F.2d 300 (2d Cir.1981), *cert. denied*, 454 U.S. 1148, 102 S.Ct. 1012, 71 L.Ed.2d 301 (1982); *Zimmer v. Wells Management Corp.*, 366 F.Supp. 215, 216 (S.D.N.Y.1973)). As pointed out, to calculate interest as of the date of anticipatory repudiation would afford plaintiff a windfall in contravention of the compensatory purpose of section 5001. *Esquire Radio* at 796 (citing *Morse v. Swank Inc.*, 520 F.Supp. 829, 830 (S.D.N.Y.1981), *aff'd*, 688 F.2d 816 (2d Cir.), *cert. denied*, 459 U.S. 833, 103 S.Ct. 75, 74 L.Ed.2d 73 (1982)).

■ Here, the earliest ascertainable date when the breach of contract cause of action existed is March 22, 1985, when by letter, defendant advised plaintiff that it disagreed with plaintiff's conclusion that it was owed a portion of the savings realized in electrical cost of defendant and thus rejected its proffered invoice. Invoices for 38 more months were submitted to the plaintiff on January 31, 1991, covering the period through March 31, 1988, just prior to the institution of this litigation. Where damages are incurred at various times, interest shall be computed upon each item from the date it was incurred or upon all of the damages from a single reasonable intermediate date. CPLR § 5001(b). Such a reasonable date is September 26, 1987, the median date between the accrual of the cause of action and the final month of March 1988 for which an invoice was submitted. That interest is assessable at the rate of nine percent. CPLR § 5004. The plaintiff is, therefore, entitled to interest in the amount of $218,073.22 which represents interest at nine percent on the net recovery of $543,484.65 from September 26, 1987, through the date of this Order.

I further find that the defendant's counterclaim for recovery of the $6,500 service fee must be denied due to its breach of the agreement and failure to show non-compliance by plaintiff with the terms thereof. Plaintiff fully performed its obligation under the agreement by analyzing the submitted utility bills and recommended that defendant adopt 3–B. It is, therefore,

ORDERED, that the Clerk of the Court shall enter judgment on behalf of the plaintiff against the defendant in the amount of $761,557.87, and dismissing the counterclaim by the defendant.

---

**2.** Defendant's argument in his post-trial brief that "savings" as used to compute interest would have to be reduced by capital expenditures by the defendant is not supported by the testimony of witness Drosdowich as counsel contends. (Compare counsel's footnote argument in his post-trial brief at p. 25 with the Drosdowich testimony at trial at pp. 581–83).