**WIS–PAK, INC., Plaintiff–Appellee,**

v.

**NATIONAL UTILITY SERVICE, INC., Defendant–Appellant.**

**No. 02–3828.**

United States Court of Appeals, Seventh Circuit.

Argued March 31, 2003.

Decided May 12, 2003.

Before BAUER, RIPPLE, and MANION, Circuit Judges.

### ORDER

Wis–Pak, Inc. operates bottling plants in several locations. It opened a new plant in Quincy, Illinois, but later discovered that the city was substantially overcharging for its water and sewer service to the plant. Wis–Pak settled the discrepancy with the city, but at the time Wis–Pak had a contract with National Utility Service, Inc. to monitor its utility bills and recommend measures that would lower utility costs. Based on this contract, NUS claims that it is owed fifty percent of the nearly two million dollars Wis–Pak recovered in its settlement with the city. In a suit for declaratory judgment, the district court granted Wis–Pak's motion for summary judgment, concluding that it did not owe NUS any amount of money under the contract. NUS appeals, and we affirm.

### I.

On June 16, 1995, Wis–Pak, Inc., a soft drink bottler, entered into a utility cost consulting agreement with National Utility Service, Inc. ("NUS"), whereby Wis–Pak authorized NUS to analyze its utility bills and offer recommendations regarding possible savings and refunds on the company's energy expenses ("Agreement"). The Agreement provided, *inter alia,* that:

> Any recommendation you [NUS] make will be considered by us [Wis–Pak] and shall be subject to our approval. We will advise you in writing [of] our intent to pursue or not pursue each of your recommendations, and in the latter case, detail the reasons. However, if any recommendation made by you is accepted by us and is subsequently implemented, we will pay you as outlined [in the Agreement] after such savings and refunds are achieved. All information pertaining to your recommendations that we accept, including correspondence with our suppliers, will be sent to you promptly for your evaluation and further advice. However, you shall not have authorization to communicate or negotiate with third party suppliers except with our express written consent.

Wis–Pak paid NUS a one-time fee of $12,000 at the commencement of the Agreement. Other than this initial fee, Wis–Pak was only required to pay NUS under the terms of the Agreement if NUS made a recommendation that Wis–Pak adopted, and which led to a refund, credit, or savings on one of the company's utility bills. If this occurred, the Agreement provided that Wis–Pak would pay, after recapturing its initial $12,000 fee, fifty percent of any refund or credit obtained as a result of any recommendation made by NUS, and fifty percent of any monthly savings realized for a period of 60 months.

In April 1998, Wis–Pak advised NUS that it was constructing a new bottling plant in Quincy, Illinois ("Quincy Plant"), and that once the plant was up and running it would have NUS analyze the utility bills the company received from the City of Quincy ("City") in conjunction with the operation of the plant. Pursuant to Wis–Pak's discussions with the City, the Quincy Plant was constructed with a water meter to measure the amount of water supplied by the City to the plant, as well as a "deduct meter," which measures the volume of water used by the plant to fill soft drink product into cans and bottles. The sole purpose of installing a deduct meter at the Quincy Plant was to calculate the amount of discharge from the plant to the City's sewer system in order to accurately compute the company's municipal sewer bill. From the time the deduct meter was installed in November 1998 until April 2000, Wis–Pak did not verify the proper functioning or reading of the deduct meter or whether the City was billing Wis–Pak for sewer service based upon readings from the deduct meter. Wis–Pak assumed, incorrectly, that the City would read the deduct meter and adjust the Quincy Plant's water and sewer bills in accordance with such meter readings.

In January 1999, Wis–Pak began sending NUS the company's water/sewer bills for the Quincy Plant (but did not advise NUS that it had installed a deduct meter at the Quincy Plant). On November 24, 1999, NUS sent Wis–Pak a letter and a report ("Report") dated November 23, 1999, that contained, *inter alia*, the following observations and recommendations:

We note at the [Quincy Plant] you are currently receiving your water service requirements from the City of Quincy. We note that the sewer charges applied are based on the presumption that 100% of the water delivered is being discharged into the sewer system. In many cases, we have found the discounts on these charges can be obtained where it is determined that not all the waste water is being returned to the sewer system. That is, where there is a significant loss of water due to use in processing, steam heat, recirculation, cooling towers, evaporation or any means, relief can be obtained in proportion to the amount of water which is consumed in lieu of being discharged into the sewer system.

We would suggest investigating this possibility by having the appropriate personnel at this facility determine the approximate amount of water that is retained (not eventually deposited into the sewer system).

If your findings indicate a sizable amount of water remains in your operation as to warrant consideration of this proposal, we believe that additional action would be advisable. It has been our experience that some utilities accept a certain percentage of water that is retained in your operation, often based upon industry standards or some other estimate, while others may require the installation (either temporary or permanent) of a sewer outflow meter. Our analysis (based upon the period 9–14–98 to 3–15–99) indicates annual savings of approximately $2,400, based on the assumption that 4% of your metered water is not returned to the sewer system. Of course, this is an estimate and actual savings may vary based upon factors such as usage, rate revisions, etc.

John Uttech, Wis–Pak's vice president of operations, received NUS's Report but did nothing with it because Wis–Pak had already installed a deduct meter at the Quincy Plant, and because he believed that Michael Zeman, Wis–Pak's project manager for the Quincy Plant, was reviewing the

company's quarterly water and sewer bills for that facility. Zeman, however, neither received nor reviewed these bills. Instead, the City sent them directly to Wis–Pak's accounts payable department in Watertown, Wisconsin, where they were paid but apparently not reviewed for accuracy.

On January 25, 2000, the City sent a letter directly to the Quincy Plant, advising Wis–Pak that because the company's sewer discharge was especially high it would be required to pay an additional surcharge charge on its water and sewer bills. This letter was brought to Zeman's attention who in turn advised Mark Kimmel, Wis–Pak's director of operations, of the surcharge being imposed by the City.

On March 30, 2000, NUS sent a letter to Wis–Pak advising that "a review of the numerous recommendations provided you by NUS ... indicates that all recommendations presented maintain their viability and savings potential." In that correspondence, NUS also requested that Wis–Pak "review the recommendations again, and provide us your formal response regarding the actions taken and to be taken regarding the investigation and implementation of these items." Finally, NUS opined "that the implementation of our recommendations could result in annual savings [of] over $300,000." At no time between Wis–Pak's receipt of the Report and its receipt of the March 30, 2000 letter did Wis–Pak formally reject the recommendation made by NUS for sewer savings at the Quincy Plant, advise NUS that it did not understand or agree with the recommendation contained in the Report, or otherwise communicate any complaint, criticism, or objection to the Report or recommendation contained therein.

In May 2000, Kimmel reviewed Wis–Pak's financial statements for the first four months of the calender year, and in doing so noticed that the water and sewer charges for the Quincy Plant were extremely high. As a result of this review, Kimmel contacted the company's accounting department and requested a copy of the most recent water and sewer bill for the Quincy Plant, which he then showed to Zeman. Upon examining the bill (dated April 3, 2000), Zeman immediately knew that the company was being overcharged because, in addition to the excessive nature of the sewer charges ($86,798.44), the bill also contained no "deduct meter amount." Zeman then spoke with the City and confirmed that it had not been reading the deduct meter, and was instead billing Wis–Pak as if all of the water coming into the plant was being discharged into the City's sewer system.

From May through December 2000, Wis–Pak and the City ran tests and readings on both the incoming and deduct meters at the Quincy Plant. Based on the testing and studies that occurred during that time period, the City concluded that eighty percent (80%) of the water delivered to Wis–Pak by the City was going into the company's soft drink products and that the remaining twenty percent (20%) was being discharged into the City's sewer system. Testing also revealed that the City's meter had been under-registering incoming water by almost eighteen percent (18%). The City concluded that Wis–Pak had been under-billed for incoming water by $23,394.90 and over-billed for outgoing sewer by $236,763.15. In December 2000, Wis–Pak and the City agreed that in the future Wis–Pak would be billed for sewer at 20% of the volume of water coming into the Quincy Plant (an estimate based on actual meter readings). On January 9, 2001, Wis–Pak and the City agreed that Wis–Pak would receive a credit of $241,763.15, which would be applied against future water and sewer charges that Wis–Pak incurred. The City thanked

Zeman for bringing the billing error to its attention, and for working with the City to resolve the matter. At the time Zeman handled this matter, he had no knowledge of NUS's consulting role with Wis–Pak or of the November 23, 1999 Report's existence.

During this same time period, NUS and Wis–Pak exchanged several written and oral communications, but Wis–Pak did not advise NUS of its ongoing discussions and negotiations with the City regarding the foregoing billing error. On July 10, 2001, NUS sent a facsimile to Wis–Pak which noted:

> We recently reviewed your water/sewer invoices for the referenced account rendered by the City of Quincy ... [and] are pleased to note that our recommendations regarding the sewer service has [sic] been implemented and savings are being realized. We are in the process of preparing statements reflecting the savings realized and will forward same to your attention shortly. We ask that you continue to provide us copies of the quarterly invoices for this service on a regular basis. We also note that present on your water/sewer invoice for the period September 29, 2000 to January 3, 2001 was a sizable credit. Unfortunately, the details of this credit were not included on the invoice. Accordingly, any information you can provide concerning the details of same would be gratefully appreciated.

NUS followed up on its July 10, 2001 correspondence by sending Wis–Pak invoices totaling $984,986.12, the amount it claimed entitlement to under the terms of the parties' Agreement.[1] Wis–Pak refused to pay these invoices, and, on October 30, 2001, the company filed a civil action in the Circuit Court of the State of Wisconsin against NUS, seeking a declaratory judgment with respect to the parties' rights and obligations under the Agreement. In short, Wis–Pak argued that it was not required to pay NUS anything under the Agreement as a result of it achieving a credit on future water/sewer bills or making billing arrangements with the City in accordance with certain meter readings.

On November 21, 2001, NUS removed the case to the United States District Court for the Western District of Wisconsin, pursuant to 28 U.S.C. §§ 1332, 1441, and 1446, and in so doing answered Wis Pak's complaint and filed a counterclaim, seeking damages for breach of contract, quantum merit, unjust enrichment, specific performance, and declaratory relief. According to NUS, the Agreement covered the credit and "savings" obtained by Wis–Pak from the City of Quincy because: (1) NUS identified that the City was billing Wis–Pak for sewer charges based on a presumption that Wis–Pak was discharging one hundred percent of its incoming water to the City's sewer system, (2) NUS made recommendations for addressing the problem; and (3) the recommendations NUS made encompassed the actions Wis–Pak took to remedy the problem. The parties subsequently filed cross motions for summary judgment, and the district court granted Wis–Pak's motion, concluding that the company "did not implement any of the recommendations [NUS] made in its November 23, 1999 report .... [but instead] achieved savings as a result of investigating the city's erroneous sewer billings and its failure to deduct from the sewer bills the eighty (80%) percent of

---

1. Specifically, NUS seeks fifty percent of the credit that Wis–Pak received from the City ($120,881.58), and fifty percent of the monthly "savings" the company received from its arrangement with the City–i.e., billing outgoing sewer at 20% of the amount of water coming into the plant–over a 60–month period ($864,104.54).

incoming water that went into [Wis–Pak's] product and should have been reflected on the deduct meter, not because it followed any of [NUS's] recommendations." NUS appeals this decision, and we affirm.[2]

## II.

This court reviews the district court's grant of summary judgment *de novo,* construing all fact in favor of NUS, the non-moving party. *Dersch Energies, Inc. v. Shell Oil Co.,* 314 F.3d 846, 854 (7th Cir. 2002).

This case boils down to a simple question: Did Wis–Pak accept and subsequently implement the savings recommendation made by NUS for the Quincy Plant in its November 23, 1999 Report? On appeal, NUS claims that the district court erred in concluding that Wis–Pak did not accept and implement the recommendation contained in the Report because "[a] review of the text of [the] Report clearly establishes that NUS recommended that Wis–Pak *investigate* why the [City] was treating 100% of the water delivered to the Quincy Plant as being discharged into the sewer system and the possibility of obtaining a refund (i.e., a refund of prior overcharges and a reduction of sewer charges on future bills)," and because Wis–Pak did indeed accept and implement this recommendation. We disagree.

NUS did not recommend that Wis–Pak investigate why the City was billing the company for sewer charges based on a presumption that one hundred percent of the water coming into the Quincy Plant was being discharged back into the City's sewer system; nor did NUS recommend that Wis–Pak seek a refund for any amount that the company may have been overbilled. Instead, NUS gave Wis–Pak a two-step recommendation. First, NUS recommended that Wis–Pak have "the appropriate personnel at [the Quincy Plant] facility determine the approximate amount of water ... retained," i.e., water not eventually deposited into the sewer system, "due to use in processing, steam heat, recirculation, cooling towers, evaporation or any means."[3] Second, NUS advised Wis–Pak that *if* the company found "a sizable amount of water remains in your operation," due to "use in processing, steam heat, recirculation, cooling towers, evaporation or any means," it should attempt to obtain "relief ... in proportion to the amount of water which is consumed in lieu of being discharged into the system" by: (1) getting the City to "accept [that] a certain percentage of water ... is retained in your operation ... based on industry standards or some other estimate"; or (2) installing a temporary or permanent sewer outflow meter.

The record clearly shows, however, that Wis–Pak neither accepted nor implement-

---

**2.** NUS does not challenge the district court's decision to grant Wis–Pak summary judgment on its quantum merit, unjust enrichment, and specific performance claims, and thus any issues relating to these claims have been waived. *Gable v. City of Chicago,* 296 F.3d 531, 538 (7th Cir.2002).

**3.** As the district court properly noted:
[NUS] fails to acknowledge that it did not recommend that [Wis–Pak] obtain "a determination from the City of Quincy of the amount of water delivered to the facility

that was not returned to the sewer system," which would have required the city to examine its procedures, directives, oversight and meter reading capabilities; rather, [NUS] recommended that [*Wis–Pak's*] employees identify amounts of water that might be consumed during operations and not going into the sewer. [NUS] never suggested that [Wis–Pak] ask the *city* to determine why the city's records did not take the deduct meter readings into account.

ed the foregoing recommendation. At no time did Wis–Pak direct any of its employees to investigate or determine the amount of water being retained inside the Quincy Plant. Indeed, the very idea that Wis–Pak would even consider issuing such a directive is entirely implausible. There is no question that both Wis–Pak and the City were already well aware that the overwhelming majority of the water coming into the Quincy Plant was being retained, as opposed to being discharged into the City's sewer system, as a result of the plant's bottling and canning operations (i.e., the water was being used to produce the soft drink product). Long before NUS submitted its Report, Wis–Pak had already installed a deduct meter at the Quincy Plant, the sole purpose of which is to measure the amount of water diverted for the plant's operations from the incoming water so that the City can accurately calculate the amount of water deposited by the plant into the municipal sewer system. As such, there would not have been, nor was there, any reason for Wis–Pak to inquire into how much water was being retained by the operation of the Quincy Plant for the purpose of achieving a discount on the company's sewer bill. Wis–Pak and the City had already agreed that the plant's water bill would be based on, and thus reduced in accordance with, the installed deduct meter. In this respect, we agree with the district court that Wis–Pak "did not implement any of the recommendations [NUS] made in its November 23, 1999 report," but instead "achieved these savings as a result of investigating the city's erroneous sewer billings and its failure to deduct from the sewer bills the 80% of incoming water that went into [Wis–Pak's] product and should have been reflected on the deduct meter."

In arguing that it is entitled to payment under the terms of the Agreement, NUS describes its Report recommendation as follows: "that Wis–Pak *investigate* the potential billing error identified by NUS (i.e., ... why the [City] was treating 100% of the water delivered to the Quincy Plant as being discharged into the sewer system) and the possibility of obtaining relief." This characterization of NUS's recommendation is entirely untenable. First, NUS's use of the term potential billing error, while perhaps accurate, completely undermines its interpretation of the language contained in the Report recommendation. Although it is true that NUS advised Wis–Pak that "sewer charges applied are based on the presumption that 100% of the water delivered is being discharged into the sewer system," the Report does not assert that the City's use of this "presumption," standing by itself, was necessarily of any great significance. Instead, the Report "suggest[s]" that Wis–Pak "investigat[e]" the "possibility" that "there is a significant loss of water due to use in processing, steam heat, recirculation, cooling towers, evaporation or any means." The Report then advises that "[i ]f your findings indicate a sizable amount of water remains in your operations *as to warrant consideration of this proposal,* we believe that *additional action* would be advisable [i.e., make arrangements with the City to have the plant's sewer bill based on an estimate obtained by way of "industry standards" or a "sewer outflow meter"]." (Emphasis added.) In other words, NUS's recommendation that Wis–Pak enter into discussions with the City about achieving savings on its sewer service at the Quincy Plant was *conditioned upon* the company *first determining* that a "significant amount of water" was being retained during plant operations. As previously noted, however, Wis–Pak neither accepted nor implemented NUS's recommendation to inquire into whether a significant amount of the water coning into the Quincy Plant was being

retained by plant operations because it already knew that to be the case. Wis–Pak's decision not to conduct such an investigation renders the remainder of NUS's recommendation, which was conditioned upon such an inquiry being undertaken, meaningless. In short, NUS did nothing more than advise Wis–Pak of something it was already aware of (that some amount of incoming water is retained as a result of plant operations) and recommend a course of action that the company had already taken (make billing arrangements with the City based on an estimate of the amount of water retained during plant operations through the installation of a deduct meter).

The record also shows that the City was not billing Wis–Pak based on a presumption that all of the water it delivered to the company was being discharged into the municipal sewer system. As previously noted, the root cause of Wis–Pak being overbilled by the City for sewer service at the Quincy Plant was that the charges assessed to the company were not calculated in accordance with the plant's deduct meter, as had been agreed to by the parties long before NUS submitted its Report to Wis–Pak. As the district court noted, "[Wis–Pak] approached the city to determine why it was not receiving credit for the amounts measured by the deduct meter, not to propose a discount based on a deduction for minor amounts of water consumed in operations." Moreover, it is undisputed that the City and Wis–Pak were both operating under the mistaken belief that the other was handling the deduct meter readings. NUS's Report neither addressed nor recommended a solution for this "error."

Finally, NUS did not recommend that Wis–Pak seek a refund of prior overcharges. NUS noted in its report that "[i]t has been our experience that some

utilities accept a certain percentage of water that is retained in your operation, often based upon industry standards or some other estimate, while others may require the installation (either temporary or permanent) of a sewer outflow meter." Although this might imply that Wis–Pak could obtain prospective relief, there is nothing in the Report remotely suggesting that Wis–Pak should seek a refund or that it might be entitled to receive one. Additionally, with respect to prospective savings, the recommendation contained in NUS's Report was of no value to Wis–Pak. As the district court explained,

> Even if [NUS] were correct in asserting that [Wis–Pak] had implemented [NUS's] recommendation when it worked out a flat rate with the city, it would make little difference to the outcome of this case. Once the city recognized the problem in its billing, it had to adjust the past bills it had sent to [Wis–Pak] and develop a reliable method for charging [Wis–Pak] in the future. It could have chosen a meter reading or an average based on the meter readings it took during the investigation stage, or, presumably, simply made some sort of estimate. *Nothing in the record indicates that the method of averaging that it chose produced savings for [Wis–Pak] greater than regular or correct readings [of the existing deduct meter] would have produced. Without proof of savings, there is nothing for [NUS] to split with [Wis–Pak].*

(Emphasis added.)

NUS, however, maintains that "it would be inequitable to deny [it] compensation ... upon the ground that no specific reference was made in the Report to the installed deduct meter" because "NUS had no way of knowing the deduct meter existed because Wis–Pak's invoices did not include any evidence ... of its existence and Wis–

Pak failed to inform NUS that a deduct meter previously had been installed at the facility." NUS also seems to suggest that it would also be inequitable to deny it a pro rata share of the credit and "savings" obtained by Wis–Pak as a result of its negotiations with the City because, according to NUS, the Report was the impetus behind Wis–Pak's investigation into the accuracy of its sewer bills. We find both of these arguments unpersuasive.

First, as previously noted, NUS did not develop any arguments with respect to its quantum merit and unjust enrichment claims, and thus has waived these issues on appeal. *Gable,* 296 F.3d at 538. Second, even in the absence of such a waiver, NUS cannot prevail on either of these claims based on principles of equity. To the contrary, allowing such a recovery would stand equity on its head. Although it is true that Wis–Pak did not advise NUS of the deduct meter, it is hard to fathom how the failure to do so entitles NUS to a recovery of almost one million dollars.

Additionally, although NUS is correct in asserting that "[t]he undisputed facts establish that for 16 months no one at Wis–Pak reviewed the sewer bills to determine whether the meter readings from the previously installed deduct meter were being applied," there is nothing in the record to support its contention that "[a]s a result of Wis–Pak's investigation of the billing error identified in the Report, it discovered that it had wrongly assumed the City was reading and taking into account the installed deduct meter." Wis–Pak's failure to monitor the accuracy of its water/sewer bills for a 16–month period is beside the point. As the district court explained, this criticism is "irrelevant to the determination of [NUS's] entitlement to a share of [Wis–

Pak's] sewer savings because [NUS] never made [it] the subject of a recommendation." Furthermore, NUS did not identify "a billing error," but rather, as NUS notes on several occasions in its briefs, a "potential billing error." A potential billing error that, if accepted and implemented, would, according to NUS, result in a minimal amount of savings (4% or $2,400). Indeed, the vast disparity between NUS's estimate of the water retained by Wis–Pak's operations at the Quincy Plant (4%) and the actual amount of water retained (80%) strongly suggests that the Report was either a modified version of a generic report sent out to all of NUS's business customers, or that NUS was woefully ignorant of the manner in which a bottling plant operates. In either case, it is clear that NUS is seeking a windfall, not equity. *See Dispatch Automation, Inc. v. Richards,* 280 F.3d 1116, 1119 (7th Cir.2002) (noting that "[w]hen a contractual interpretation makes no economic sense, that's an admissible and, in the limit, a compelling reason for rejecting it").

Lastly, the record does not support NUS's assertion that its Report was the catalyst behind Wis–Pak's decision to inquire into the accuracy of its water/sewer bills.[4] Instead, the record shows that Wis–Pak decided to conduct this inquiry in May 2000, more than five months after receiving NUS's Report, when Zeman, upon examining the most recent water/sewer bill for the Quincy Plant, concluded that the charges assessed were so excessive that the City could not possibly be billing the company in accordance with the plant's deduct meter. Moreover, NUS does not point to any evidence that would rebut Wis–Pak's assertion that Zeman, the company official responsible for initiating a

---

4. This argument is also inconsistent with NUS's repeated contention that it is not required "to prove a causal connection between the recommendation made and the savings achieved," an issue we need not address.

dialog between Wis–Pak and the City, had no knowledge of NUS's consulting role with the company or of the existence of the Report. Given the foregoing, we conclude that there is simply no basis for NUS's assertion that Wis–Pak unjustly benefitted from any "advice" contained in the Report.

### III.

For the reasons expressed in this opinion, we AFFIRM the district court's decision granting Wis–Pak's motion for summary judgment.