# IN THE SUPREME COURT OF IOWA

No. 13–0253

Filed November 7, 2014

**SHELBY COUNTY COOKERS, L.L.C.,** an Iowa Limited Liability Company,

Appellee,

vs.

**UTILITY CONSULTANTS INTERNATIONAL, INC.,** a Michigan Corporation,

Appellant.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Shelby County, James M. Richardson, Judge.

A utility bill review consultant seeks further review after the district court and court of appeals both concluded the consultant's short-lived contract with a bacon producer was a contract for services terminable at will. **COURT OF APPEALS DECISION VACATED; DISTRICT COURT DECISION REVERSED AND CASE REMANDED.**

M. Brett Ryan of Watson & Ryan, P.L.C., Council Bluffs, for appellant.

James G. Powers and April N. Hook of McGrath North Mullin & Kratz, P.C. L.L.O., Omaha, Nebraska, for appellee.

**HECHT, Justice.**

Hoping to reduce its expenses, a company contracted with a consultant whose business is reviewing utility bills and pursuing refunds of overpayments. The company terminated the contract after the consultant reviewed four utility bills and informed the company it was entitled to a substantial refund for sales tax overpayments. The company sought a declaratory judgment establishing it had no remaining contractual obligation to the consultant, and the consultant counterclaimed for breach of contract. The district court determined the company's liability under the contract was limited to services the consultant provided prior to termination and dismissed the consultant's counterclaim on the ground no payment was owed to the consultant until the company actually receives a refund. The consultant appealed, and the court of appeals affirmed. We granted the consultant's application for further review.

## I. Background Facts and Proceedings.

The following facts are supported by substantial evidence in the summary judgment record. Utility Consultants International, Inc. (UCI) conducts utility billing reviews for its customers searching for errors or overpayments that might lead to refunds or other savings. In late July 2011, Shelby County Cookers, LLC (SCC) received an unsolicited phone call from Jackie Tanguay, a representative of UCI. Troy Schaben, SCC's plant controller, took the call. Tanguay told Schaben about UCI's services and offered to perform a utility review for SCC.[1]

---

[1]During this telephone call, Tanguay did not reveal that UCI's billing reviews commonly scrutinized customers' utility bills for sales tax overpayments. She explained generally to Schaben that UCI could review SCC's utility bills and search for any possible errors.

Schaben expressed interest in UCI's services during the initial phone conversation with Tanguay, but no contract for services was formed that day. Tanguay and Schaben had additional telephone conversations over the next several days. Tanguay urged Schaben to send to UCI copies of SCC's utility bills covering a period of three months. Tanguay proposed that UCI would perform a "free preliminary review" of the bills. Schaben agreed to UCI's proposal, sending four of SCC's utility bills to Tanguay.[2]

In early August 2011, Tanguay contacted Schaben again, indicating UCI had completed its preliminary review of the four SCC utility bills. Tanguay informed Schaben that the preliminary review led UCI to conclude it could obtain "a large refund" for SCC. During this conversation, Tanguay did not specify the source or anticipated amount of the potential refund, nor did she explain the process through which a refund could be pursued.

On August 9, 2011, Schaben signed UCI's form contract, indicating he did so as SCC's plant controller. UCI's president, David Dawson, signed the contract for UCI. The contract provides, in its entirety:

> This agreement authorizes UTILITY CONSULTANTS INTERNATIONAL, INC. to pursue refunds and bill reductions, on your behalf, on your utility billings.
>
> If UTILITY CONSULTANTS INTERNATIONAL, INC. is successful in obtaining a refund(s) for your company(ies), you[r] fee obligation is 50% of the refund(s). Payable only if and when a credit has been applied to your account or a check has been issued to you. The future cost reductions, as defined by when the utility adjusts your account(s) strictly accrue to you.

---

[2]The record does not explain why Schaben actually sent only four bills to UCI, instead of bills for the previous three months as Tanguay requested.

If you accept our money saving proposal, please sign where indicated.

Thank you,
UTILITY CONSULTANTS INTERNATIONAL, INC.

After UCI received the signed contract from SCC, Tanguay called Schaben and requested that SCC transmit copies of its utility bills for the previous thirty-six months.[3] During this conversation, Tanguay first disclosed to Schaben the reason for the potential refund: overpayments of sales taxes detected in SCC's utility bills.[4] It is undisputed that SCC did not know it had a claim for a refund of sales tax overpayments until Tanguay disclosed the information to Schaben after the parties formed their contract.

Upon learning UCI's review had revealed a potential refund claim, Schaben notified SCC's secretary and treasurer, Bradley Poppen. Poppen instructed Schaben not to release more information to UCI until SCC clarified the scope of UCI's services. When Tanguay called later to ask why SCC had not yet sent the additional utility bills she had requested, Schaben explained that Poppen's approval of the transaction was required and that Poppen was now handling the matter. After this call, Schaben had no further communication with UCI. However, he

---

[3]It does not appear from the record that the term of thirty-six months was discussed before the parties signed the written agreement. However, it appears Tanguay requested billings for thirty-six months because UCI understood tax refund claims are time-limited. *See* Iowa Code § 422.73(1) (2011) (allowing taxpayers three years to claim refunds).

[4]UCI's president, David Dawson, explained in his deposition that UCI's primary business focus is on sales tax reviews. Dawson further testified it is UCI's practice not to tell clients—until after a written contract with UCI is signed—that refunds will likely be based on sales tax overpayments. According to Dawson, UCI follows this approach because if potential clients realized the utility bill review would be focused on tax overpayments, they would not hire UCI, and instead assign the project to their tax accountants.

decided to investigate SCC's tax payments to determine how much tax SCC had overpaid on its utility bills.

On September 2, 2011, Poppen sent an email message to Dawson requesting specific details about the scope of UCI's services and a proposed percentage or hourly rate for those services. Dawson interpreted Poppen's message as suggesting the parties should form a new contract. Dawson's response to Poppen asserted no new contract was needed because the parties already had a signed agreement for UCI's services.

The parties' relationship deteriorated. Poppen presented an ultimatum to UCI: unless an acceptable agreement could be reached as to the precise scope of UCI's proposed work, SCC would terminate the existing contract. Dawson responded that the existing contract was sufficiently detailed and also asserted UCI had already performed when it "identified erroneous taxes that [SCC was] being charged."[5] On September 20, 2011, Poppen sent a letter to UCI, denying the existence of a valid contract between the parties[6] and stating alternatively that "to the extent [the] agreement is valid, it is hereby TERMINATED effective as of today's date." UCI performed no additional services for SCC after receiving the notice of termination. SCC hired an accounting firm to pursue a refund for sales tax overpayments.

SCC filed a petition for declaratory judgment requesting the court's determination that the parties had no binding agreement and that UCI

---

[5]The record does not reveal whether UCI disclosed to SCC a projected or estimated amount of the potential refund before litigation of this case began.

[6]Although SCC initially denied the written agreement was supported by valid consideration and claimed Schaben was not authorized to sign the written agreement with UCI, this argument was later abandoned and is not before us on appeal.

was not authorized to pursue refunds on SCC's behalf. UCI counterclaimed, alleging SCC breached the parties' contract by refusing to provide UCI with copies of SCC's utility bills and denying UCI the opportunity to procure the refunds.

SCC filed a motion for summary judgment. The district court granted the motion, holding the contract was limited in duration to the period between August 9, 2011, when Schaben signed the contract for SCC, and September 20, 2011, when Poppen's letter terminated it. The district court also determined that although the parties' signed writing left the scope of the agreement unspecified, their actions indicated the only service UCI actually provided was its review of four utility bills. Thus, the district court ruled UCI was entitled to fifty percent of any refund SCC receives for overpayment of sales taxes on those four bills. The court further concluded, however, that UCI is owed nothing under the contract until the Iowa Department of Revenue actually refunds any overpayments to SCC.[7]

UCI appealed, and we transferred the case to the court of appeals. The court of appeals affirmed the district court's ruling. UCI sought, and we granted, further review.

## II. Scope of Review.

Generally our standard of review for declaratory judgment actions "is determined by the manner in which the action was tried to the district court." *SDG Macerich Props., L.P. v. Stanek Inc.*, 648 N.W.2d 581, 584 (Iowa 2002). However, in this case we need not determine whether the

---

[7]When the motion for summary judgment was filed, SCC's application for a refund of more than $250,000 from the state was pending. As SCC had not yet received a refund, however, the district court concluded UCI's claim for contract damages was not yet ripe. Accordingly, the court dismissed UCI's counterclaim.

case was tried at law or in equity, because we are reviewing the district court's decision to grant summary judgment. "Thus, we base our review on the propriety of the district court's summary judgment ruling, not the declaratory judgment." *Boelman v. Grinnell Mut. Reins. Co.*, 826 N.W.2d 494, 500 n.1 (Iowa 2013); *see also Ferguson v. Allied Mut. Ins. Co.*, 512 N.W.2d 296, 297 (Iowa 1994). We review the district court's summary judgment ruling for correction of errors at law. *Boelman*, 826 N.W.2d at 500; *SDG Macerich Props.*, 648 N.W.2d at 584. Because UCI is the nonmoving party, we make all reasonable factual inferences in its favor. *Boelman*, 826 N.W.2d at 501.

### III.  The Parties' Positions.

The parties' main disagreement concerns the effect of SCC's letter of September 20, 2011. SCC insists the letter constituted reasonable notice that it was terminating a written contract for services which included no durational term. In contrast, UCI characterizes the letter as a repudiation of the contract constituting a material breach.

**A. Utility Consultants.** UCI maintains that while it only reviewed four of SCC's utility bills before repudiation, the information it revealed to SCC after reviewing those bills constituted performance with value far exceeding the potential refund expected for sales tax overpayments on those four bills. Accordingly, UCI asserts the district court committed legal error in deciding UCI's expectation interest is limited to damages based on any refund derived from only the four bills it reviewed before SCC repudiated the contract. UCI further contends a genuine issue of material fact on the damage issue precludes summary judgment.

**B. Shelby County Cookers.** SCC urges us to affirm the district court's judgment and the decision of the court of appeals. As the written contract for services had no specific duration, SCC contends it was

lawfully terminated, not repudiated, by the September 20 letter. SCC further contends the scope of the contract was properly limited to any refunds derived from the four bills UCI actually reviewed. Finally, SCC asserts the district court correctly concluded UCI had no claim for damages at the time summary judgment was entered because SCC had not yet received a tax refund.

### IV. Analysis.

Our adjudication of the contract's durational term significantly affects the merits of the parties' contentions. Accordingly, we address that subject first.

**A. Duration of the Contract.** To determine whether SCC's September 20 letter constituted evidence of a lawful termination or an anticipatory repudiation precluding the summary judgment granted by the district court, we first ask whether "the language within the four corners of the document" expresses the contract's duration. *Clinton Physical Therapy Servs., P.C. v. John Deere Health Care, Inc.*, 714 N.W.2d 603, 615 (Iowa 2006) (noting contract analysis almost always begins with the contract's plain language). In this instance, however, the contract document does not prescribe a durational term for the parties' relationship.

"The law in Iowa is not well developed regarding the duration of contracts where the parties fail to specify a duration." *Keppy v. Lilienthal*, 524 N.W.2d 436, 439 (Iowa Ct. App. 1994). SCC relies heavily on language from *Hess v. Iowa Light, Heat & Power Co.*, 207 Iowa 820, 221 N.W. 194 (1928) (per curiam), in asserting the contract with UCI was indefinite and SCC's termination was proper under the circumstances presented here. In *Hess* we stated, "where no time limitation is inserted in a contract for the performance of services, . . . the contract is regarded

as terminable by either party on reasonable notice." *Hess*, 207 Iowa at 826, 221 N.W. at 196–97. However, SCC's reliance on *Hess* is misplaced.

In *Hess*, the plaintiff sued on a contract entitling him to receive free heat and electricity "in consideration of [his] services as director of the Carroll Light & Heat Company . . . ." *Id.* at 822, 221 N.W. at 195 (emphasis omitted). Carroll Light subsequently went out of business and the Iowa Light, Heat & Power Company succeeded it. *Id.* The successor company sent a letter to Hess, notifying him that he would no longer receive free utilities because he was no longer serving as a director of Carroll Light. *Id.* Hess maintained he was entitled to continue receiving free electricity and heat indefinitely and sued to enjoin Iowa Light from discontinuing the arrangement. *Id.* at 823, 221 N.W. at 195–96. The district court dismissed the action, and we affirmed on the ground that Iowa Light owed Hess no obligation under his contract with Carroll Light. *Id.* at 825, 221 N.W. at 196. We reasoned further that, because Hess no longer served as a corporate director of Carroll Light, he had no continuing entitlement for free utilities under the express terms of the contract. *Id.* Put another way, our decision in *Hess* was firmly based on our interpretation of an express contract term. It is therefore clearly not dispositive in this case, which turns on a term not expressed in the parties' written contract.

SCC points to the above-quoted language in our *Hess* opinion suggesting that even if the contract had conferred upon Hess an entitlement with no express time limitation, Iowa Light could have terminated the contract for services at will upon reasonable notice. *See id.* at 826, 221 N.W. at 196–97. That language is clearly dicta, however, and does not control our decision in this case.

Because *Hess* is not controlling, we look to other courts' decisions for guidance and find a commonly expressed framework applied in cases addressing contracts omitting a durational term. A California court has described the framework in this way:

> The court first seeks an express term. If one is absent, the court determines whether one can be implied from the nature and circumstances of the contract. If neither an express nor an implied term can be found, the court will generally construe the contract as terminable at will.

*Zee Med. Distrib. Ass'n, Inc. v. Zee Med., Inc.*, 94 Cal. Rptr. 2d 829, 835 (Ct. App. 2000); *see also Consol. Theatres, Inc. v. Theatrical Stage Emps. Union, Local 16*, 447 P.2d 325, 333 (Cal. 1968). Other courts utilize a similar framework. *See, e.g., Loftness Specialized Farm Equip., Inc. v. Twiestmeyer*, 742 F.3d 845, 853 (8th Cir. 2014) (applying Minnesota law and noting termination of an indefinite contract is allowed upon reasonable notice, but only if the contract has neither an express durational term nor a term that can be implied); *S. Bell Tel. & Tel. Co. v. Fla. E. Coast Ry.*, 399 F.2d 854, 858 (5th Cir. 1968) ("[A] contract in which the parties express no period for its duration *and* no definite time can be implied . . . can be terminated at will by either party . . . ." (emphasis added)); *Haines v. City of New York*, 364 N.E.2d 820, 822 (N.Y. 1977) ("It is generally agreed that where a duration may be fairly and reasonably supplied by implication, a contract is not terminable at will.").

Finding no express durational term in the contract between SCC and UCI, we next inquire whether the omitted term can be implied from the nature and circumstances of the contract. To aid us in this inquiry, we look to the Restatement (Second) of Contracts section 204. This section provides that when contracting parties "have not agreed with respect to a term which is essential to a determination of their rights and

duties, a term which is reasonable in the circumstances is supplied by the court." Restatement (Second) of Contracts § 204, at 96–97 (1981); *see also Nat'l Util. Serv., Inc. v. Cambridge-Lee Indus., Inc.*, 199 F. App'x 139, 144 (3d Cir. 2006) ("A contract whose obligations are of indefinite duration should be interpreted to require performance for a reasonable period of time."); *Haines*, 364 N.E.2d at 822 ("[W]here the parties have not clearly expressed the duration of a contract, the courts will imply that they intended performance to continue for a reasonable time.").

The durational term of the contract between UCI and SCC is essential in adjudicating whether UCI has a viable claim for breach of contract. As the durational term of the asserted contract is essential, it is a term properly within the purview of section 204. Although we have not previously applied section 204 in this precise context, we relied on it when parties to a loan commitment agreement did not expressly state their obligations in the event the borrower defaulted on its payments to a third party. *Taylor Enter., Inc. v. Clarinda Prod. Credit Ass'n*, 447 N.W.2d 113, 116 (Iowa 1989). We have also endorsed the Restatement (Second)'s approach in many other contract contexts. *See, e.g., Rucker v. Taylor*, 828 N.W.2d 595, 602 (Iowa 2013); *Pavone v. Kirke*, 807 N.W.2d 828, 833 (Iowa 2011); *Lewis Elec. Co. v. Miller*, 791 N.W.2d 691, 695 (Iowa 2010). We find the approach instructive in reaching our decision in this case.

Section 204 provides a framework for adjudicating contract disputes that cannot be resolved by interpreting express contract terms. Restatement (Second) of Contracts § 204 cmt. *c*, at 97 ("[S]upplying . . . an omitted term is not within the definition of interpretation."); *see also* Richard E. Speidel, *Restatement Second: Omitted Terms and Contract Method*, 67 Cornell L. Rev. 785, 798 (1982) [hereinafter Speidel] ("[S]ection 204 is inapplicable until . . . the process of contract

interpretation is completed."). In supplying a reasonable durational term not expressed by the parties, we consider several factors. Most important are the parties' intent and the contract's main purpose. *See Koenigs v. Mitchell Cnty. Bd. of Supervisors*, 659 N.W.2d 589, 594–95 (Iowa 2003) (determining the duration of maintenance obligations contained in an express easement); *Keppy*, 524 N.W.2d at 439 (considering that one party "entered the agreement in order to revitalize their [swine] herd and earn money"). "[T]he probability that a particular term would have been used if the question had been raised" also bears upon reasonableness. Restatement (Second) of Contracts § 204 cmt. *d,* at 98. This probability inquiry is a factor, but is not dispositive. The court's ultimate goal is reasonableness—not just an approximation of a term the particular parties might hypothetically have negotiated. *See id.*; Speidel, 67 Cornell L. Rev. at 803. A term is reasonable in this context when it "comports with community standards of fairness and policy." Restatement (Second) of Contracts § 204 cmt. *d,* at 98. We deem a contract for services terminable at will only if we cannot ascertain a durational term by considering these factors.

The circumstances surrounding the contract between SCC and UCI reveal the parties' common purpose. UCI does not volunteer detailed information about its services unless the client demands it before signing a written contract because UCI recognizes the information it provides is valuable and worthy of protection. Thus, UCI enters contracts with clients before revealing the specific source and amount of their potential refunds. Because its compensation under the standard contract is based on a percentage of the refund its clients receive, UCI's goal is to maximize the size of clients' refunds. Although SCC did not know the amount of its potential refund or how many bills UCI would need to examine to

maximize the potential refund recovery, its primary purpose for contracting was also to recover the largest possible refund.

Having identified the parties' common purpose of achieving as large a refund for SCC as possible, we consider the duration of the agreement the parties would have deemed reasonable had the question been raised. It seems indisputable that both parties likely would have characterized their agreement as extending for the period of time necessary to complete a review of SCC's bills and obtain the largest possible refund from the appropriate authority. *See Keppy*, 524 N.W.2d at 439 (discussing the district court's finding that an oral contract with no express duration was "intended . . . to be in effect until [the] herd [of pigs] could be revitalized and the parties could make a profit"). As we have noted, the maximum refund is dictated by the three-year limitation period for tax refunds.

We next consider whether supplying a reasonable durational term under the circumstances presented here comports with our state's "standards of fairness and policy." Restatement (Second) of Contracts § 204 cmt. *d*, at 98. Iowa law affirms the proposition that information can be valuable and attests the principle that valuable information deserves protection. *See Comes v. Microsoft Corp.*, 775 N.W.2d 302, 311 (Iowa 2009) (discussing a protective order intended "to protect valuable business information . . . from disclosure," and concluding that a modified protective order would still keep valuable information shielded); *cf.* Iowa Code § 550.2(4) (2013) (defining "trade secret" as information that, in part, has actual or potential economic value). Therefore, we conclude supplying a durational term that protects the value of UCI's information is consistent with standards of fairness and this state's policy.

Other utility review cases disclose some disagreement about whether consultants performing services similar to UCI's provided valuable information to their clients. *Compare Nat'l Util. Serv., Inc. v. Callahan Mining Corp.*, 799 F. Supp. 1004, 1006 (N.D. Cal. 1990) (suggesting the client may have intended "to stiff" the consultant by using the provided information and not paying for it, and refusing to permit "such shenanigans"), *with Wis-Pak, Inc. v. Nat'l Util. Serv., Inc.*, 65 F. App'x 84, 92–93 (7th Cir. 2003) (refusing to compensate the consultant for providing a recommendation when the client discovered its utility overcharges through entirely independent means). However, when viewed in the light most favorable to UCI, we conclude the summary judgment record includes evidence from which a reasonable fact finder could find both parties believed the information UCI supplied was valuable.

SCC did not know it was overpaying sales tax before UCI revealed that fact. Armed with new knowledge, SCC undertook its own investigation to determine how large the potential refund might be. Then, after sending the September 20 letter terminating the contract with UCI, SCC hired an accounting firm to pursue a refund. The new and valuable information UCI supplied was essential to this sequence of events leading to SCC filing a refund claim. *See Terrell v. Star Coal Co.*, 327 N.W.2d 771, 774 (Iowa Ct. App. 1982) (finding that a contract to reveal possible mining locations "conveyed new, valuable knowledge . . . for which plaintiff should be compensated," because Star Coal had no idea there were coal deposits "in their own 'backyard' "); *see also Nat'l Util. Serv., Inc. v. Blue Circle, Inc.*, 793 F. Supp. 52, 55 (N.D.N.Y. 1992) ("No consideration had been given by [Blue Circle] to the use of interruptible power prior to . . . plaintiff's recommendation. Plaintiff is

thus entitled to receive the benefits of its recommendation."); *cf. Masline v. N.Y., N.H. & H. R.R.*, 112 A. 639, 640 (Conn. 1921) ("[I]mparting [valuable] information in a situation like this must involve an active process resulting in arousing or suggesting ideas or notions not before existent in the mind of the recipient."); *Soule v. Bon Ami Co.*, 195 N.Y.S. 574, 575 (App. Div. 1922) (denying recovery to a plaintiff claiming he provided valuable information, because his idea to increase profits by increasing prices "was not new, it was not original," and was simply "call[ing] attention to a fact already known").

SCC acted on the valuable information it obtained from UCI, and the summary judgment record suggests it could derive value from the contract far beyond the four bills UCI reviewed. *See Nat'l Util. Serv., Inc. v. Hop-In Food Stores, Inc.*, No. 92–74460, 1993 WL 839797, at *4 (E.D. Mich. Nov. 10, 1993) ("By its very actions, Michigan Hop-In . . . took advantage of the information supplied by NUS pursuant to the agreement."); *Nat'l Util. Serv., Inc. v. J.R. Sexton, Inc.*, No. N–88–324(JAC), 1989 WL 343048, at *2–3 (D. Conn. Nov. 3, 1989) (awarding summary judgment to the consultant after the client implemented a recommendation the consultant made, but never "forward[ed] its utility bills . . . or ma[d]e payments of any kind"); *see also Apfel v. Prudential-Bache Sec. Inc.*, 616 N.E.2d 1095, 1097 (N.Y. 1993) ("[Prudential] received something of value here; its own conduct establishes that."). Because the value SCC derived from the contract could far exceed a refund derived from overpayments on the four utility bills UCI reviewed, it is reasonable that the term of the contract should not be limited to the short period covered by those bills.

SCC protests that UCI's employee, Tanguay, never uttered the word "tax" until after the contract was signed. Although the record

supports a finding Schaben expected UCI's review to focus on amounts paid for utility services—not on tax overpayments—the contracting parties' fundamental objectives were clear: SCC wished to obtain refunds of money it paid to a utility company, and UCI wanted compensation from SCC for producing refunds. The source of, or reason for, any refunds obtained as a result of the contract was inconsequential to achieving these objectives. "When the parties' intent is ascertained, a reviewing court may not b[y] judicial construction create a new contract based on one party's unilateral understanding of the terms." *Terrell*, 327 N.W.2d at 774; *see also Peak v. Adams*, 799 N.W.2d 535, 544 (Iowa 2011) (refusing to credit one party's "unilateral intent" regarding a contract); *Waechter v. Aluminum Co. of Am.*, 454 N.W.2d 565, 568 (Iowa 1990) (noting we evaluate contracts according to the parties' objective intent, not any "undisclosed intention they may have had in mind, or which occurred to them later").

Applying the relevant factors identified in Restatement (Second) of Contracts section 204, we conclude a reasonable durational term under the circumstances in this case is determined by the limitation period prescribing the maximum possible tax refund. Stated another way, the contract permitted UCI to review SCC's utility bills and seek a tax refund on as many of SCC's utility bills as the law allows. Because tax refund claims are limited to three years, *see* Iowa Code § 422.73(1), UCI's expectation interest is limited to compensation at the contract rate on refunds received for that duration. This term prevents SCC from "eva[ding] . . . the spirit of the bargain." *See* Restatement (Second) of Contracts § 205 & cmt. *d* (noting the duty of good faith inherent in every contract and suggesting that evading the spirit of the bargain might violate that duty). Most importantly, the durational term based on the

three-year limitation period will allow UCI to claim the value of the information it conferred upon SCC. This durational term will also effectuate both contracting parties' fundamental purposes.[8]

### B. Remaining Issues.

1. *UCI's counterclaim.* The determination of whether a party has breached a contract is ordinarily for the fact finder. *Kern v. Palmer Coll. of Chiropractic*, 757 N.W.2d 651, 658 (Iowa 2008); *Iowa-Ill. Gas & Elec. Co. v. Black & Veatch*, 497 N.W.2d 821, 825 (Iowa 1993). As we have determined a reasonable durational term for the contract that was not found by the district court, we conclude the district court erred in granting summary judgment in favor of SCC. On remand, the district court shall determine whether SCC's September 20 letter constituted a repudiation amounting to an anticipatory breach of the contract supporting a judgment in favor of UCI on its counterclaim. *See Lane v. Crescent Beach Lodge & Resort, Inc.*, 199 N.W.2d 78, 82 (Iowa 1972) (stating "[a]nticipatory breach requires a definite and unequivocal repudiation of the contract" indicating the intent to refuse future performance); *see also* Restatement (Second) of Contracts §§ 250, 253, at 272, 286.

2. *Damages.* If the fact finder determines on remand that SCC breached the contract, the damages, if any, resulting from the breach

---

[8]However, we acknowledge the seeming dissonance between our holding in this case and one of the time-honored principles aiding our interpretation of contracts. We typically resolve contract ambiguities or deficiencies against the drafter. *Peak*, 799 N.W.2d at 548; *Vill. Supply Co. v. Iowa Fund, Inc.*, 312 N.W.2d 551, 555 (Iowa 1981). Although the reasonable durational term we supply is—under the peculiar circumstances of this case—advocated by and beneficial to the drafter, UCI, contracting parties are urged to reach an express agreement on the important terms of their bargains. It of course goes without saying that express agreements produce more predictable results than implied terms supplied by courts.

shall also be found.  *See Midland Mut. Life Ins. Co. v. Mercy Clinics, Inc.*, 579 N.W.2d 823, 831 (Iowa 1998) (noting the measure of damages for a breach of contract should place the nonbreaching party "in as good a position as [they] would have occupied had the contract been performed"); Restatement (Second) of Contracts § 344(a), at 102.

**V.  Conclusion.**

The district court erred in granting SCC's motion for summary judgment.  Accordingly, we vacate the court of appeals decision, reverse the district court's order granting summary judgment, and remand the case for further proceedings consistent with this opinion.

**COURT OF APPEALS DECISION VACATED; DISTRICT COURT DECISION REVERSED AND CASE REMANDED.**