# In the Iowa Supreme Court

No. 22–1941

Submitted November 12, 2025—Filed February 20, 2026

**Northwest Bank & Trust Company,**

Appellant,

vs.

**Pershing Hill Lofts, LLC, John M. Carroll,** and **John G. Ruhl,**

Appellees.

On review from the Iowa Court of Appeals.

Appeal from the Iowa District Court for Scott County, Tom Reidel (summary judgment) and Meghan Corbin (trial), judges.

The defendants seek further review of a court of appeals decision that reversed the district court's grant of summary judgment on a breach of contract claim and reversed a jury verdict on a fraud claim after finding evidence had been erroneously excluded. **Decision of the Court of Appeals Vacated; District Court Judgment Affirmed.**

McDermott, J., delivered the opinion of the court, in which all participating justices joined. Waterman, J., took no part in the consideration or decision of the case.

David T. Bower (argued) and Dana W. Hempy of Nyemaster Goode, P.C., Des Moines, and Candy K. Pastrnak of Pastrnak Law Firm, P.C., Davenport, for appellant.

Ian J. Russell (argued) of Lane & Waterman LLP, Davenport, for appellees.

**McDermott, Justice.**

A bank and a developer signed a conditional financing proposal. The proposal included an exclusivity clause requiring the developer to work solely with the bank in exchange for the bank's due diligence efforts. When one of the proposal's conditions failed to materialize, the bank proposed either to "kill the deal" or to proceed under different terms. The developer instead sought financing from other lenders without notifying the bank, prompting the bank to sue for breach of contract and fraud.

The district court granted summary judgment in the developer's favor on the breach of contract claim, concluding that the proposal was an unenforceable agreement to agree or, alternatively, that it had terminated when the condition failed. The court also excluded the proposal from the trial on the fraud claim. The jury found for the developer. The bank appealed, and the court of appeals reversed. We granted further review.

I.

In 2012, Pershing Hill Lofts, LLC, purchased a building in Davenport for redevelopment. Although Quad Cities Bank initially loaned funds for the purchase, in 2013, Pershing Hill refinanced the loan with Northwest Bank & Trust Company. Pershing Hill's managers, John Carroll and John Ruhl, later began discussions with Northwest about a construction loan. On August 31, 2015, Pershing Hill and Northwest signed a document titled "Proposed Financing for Pershing Hill Lofts, LLC Summary of Principal Terms."

The financing proposal stated that it was a "summary of terms that may lead to a commitment to lend, subject to satisfactory completion of due diligence, and a subsequent Commitment Letter." The "proposed transaction" included "the sale of certain federal and state tax credits relating to the Project to one or

more third party investors," with a $5 million bridge loan to be repaid from "the sale or realization" of the tax credits.

The financing proposal included a section titled "Due Diligence" that listed twenty items Northwest "will need as part of necessary due diligence, and as a condition to making the Interim Loans available." The list included state and federal tax credit awards, and it specifically included "Grayfield Tax Credit award documentation."

The final paragraph of the financing proposal includes an exclusivity clause in favor of Northwest as lender on the project. The paragraph stated in full:

> This is a summary of terms that may lead to a commitment to lend, subject to satisfactory completion of due diligence, and a subsequent Commitment Letter. Acceptance below assures Lender of Borrower's exclusive consideration as "Lender" in exchange for the expense in time and travel of the proposed due diligence. This Summary of Principal Terms will expire if not signed by September 4, 2015.

The document bears signatures by Northwest's president, and by Carroll and Ruhl for Pershing Hill.

In October 2015, Pershing Hill learned that, through no fault of its own, it had not been awarded the Grayfield tax credits, resulting in an $800,000 funding gap. On December 11, Northwest's president sent an email to Pershing Hill stating in relevant part:

> Without the Grayfield[] credits, [our participant bank] wants $800,000 more in equity. I have devised a plan to alter the current structure so as not to require this equity up front, but it costs Northwest Bank significant dollars. Moreover, it encompasses substantially more work for me. Even assuming we can resolve the first three issues [discussed earlier in the email], this issue alone presents three options[:] (i) kill the deal, (ii) raise $160,000 cash per partner or (iii) implement my solution at a cost of about $75,000. I know that is a lot of money, but if I am paid 1/3 at closing, I will defer the other 2/3 until construction is completed.

Would you like to meet? I think we can fix these things, but it will take my time and partnership money. Either way, it is now obvious there is no way we will close this year. Please let me know.

Soon after, on December 15, Pershing Hill began looking for an alternative lender to finance the project. But Pershing Hill also continued to communicate with Northwest. Northwest claims that between December and April, Pershing Hill made statements that led Northwest to believe it would still be the lender on the project. In late April or early May 2016, Pershing Hill secured financing with a different bank and informed Northwest.

Northwest filed a lawsuit against Pershing Hill for breach of contract and Carroll and Ruhl for negligent misrepresentation and fraud. The district court granted Pershing Hill's motion for summary judgment on the contract claim, holding that the financing proposal was an unenforceable agreement to agree and that the failure to obtain tax credits was a failed condition precedent that discharged Pershing Hill's exclusivity duty. The district court also granted summary judgment in Carroll and Ruhl's favor on the negligent misrepresentation claims, but it denied summary judgment on the fraud claims.

Before the trial on the fraud claims, the district court granted a motion in limine excluding the financing proposal. The district court concluded that in light of its summary judgment ruling, the financing proposal's probative value was outweighed by the danger that the jury would confuse it for a binding contract when considering the fraud claims. The jury ultimately entered a verdict in Carroll and Ruhl's favor.

Northwest appealed. We transferred the case to the court of appeals. Northwest argued that the district court erred in granting summary judgment on the breach of contract claim and that it abused its discretion by excluding the financing agreement (and any reference to it) in the fraud trial. The court of

appeals reversed, holding that the exclusivity clause was enforceable and not subject to a condition precedent. Given this conclusion, the court of appeals further held that the district court erred in excluding the financing proposal in the fraud trial. Pershing Hill sought further review, which we granted.

II.

**A. Northwest's Claim for Breach of the Exclusivity Clause.** Iowa law has long recognized that "an agreement to agree is not a contract." *Whalen v. Connelly*, 545 N.W.2d 284, 293 (Iowa 1996). For a contract to be enforceable, its terms must be sufficiently definite. *Air Host Cedar Rapids, Inc. v. Cedar Rapids Airport Comm'n*, 464 N.W.2d 450, 453 (Iowa 1990) (en banc). Northwest concedes that the lending terms in the financing proposal were nonbinding and unenforceable. But it argues that the exclusivity provision contained in the final paragraph was a stand-alone, severable contract that bound Pershing Hill to deal exclusively with the bank, regardless of the nonbinding nature of the rest of the proposal. Valid portions of an otherwise unenforceable agreement "can be enforced as long as they can be separated" from the invalid parts. *Miller v. Marshall County*, 641 N.W.2d 742, 751–52 (Iowa 2002).

In Northwest's view, the terms of the exclusivity clause were clear: while the bank reviewed information about whether to lend, Pershing Hill agreed to stay exclusive. On this view, the consideration for the contract is the *process* of due diligence, not the agreement to make an actual loan. Northwest further argues that the district court misread the financing proposal when it found the Grayfield tax credits constituted a condition precedent to performance. Northwest points to the language of the proposal stating that the "Grayfield Tax Credit award documentation" was a condition "to making the Interim Loans

available," not a condition on the separate promise of exclusivity, which was already in effect upon signing the proposal.

Pershing Hill counters that the entire financing proposal, by its own terms, was a "summary of terms that *may lead to* a commitment." (Emphasis added.) This, it asserts, makes the entire document a single, unenforceable agreement to agree. It argues that the exclusivity clause cannot be severed and, standing alone, is too indefinite to be enforced, particularly since it lacks any limit on its duration.

A contract need not be enforceable in its entirety for a provision within it to have independent force. In *Air Host Cedar Rapids, Inc. v. Cedar Rapids Airport Commission,* we held that a "first right to lease" was an unenforceable agreement to agree because the contract required that "terms and conditions . . . shall be as mutually agreed." 464 N.W.2d 450, 453 (Iowa 1990). But in *Air Host* we also enforced a separate provision in the same agreement for expense reimbursement, thus holding that one unenforceable clause in a document does not automatically invalidate all others. *Id.* at 452.

In this case, we similarly conclude that the exclusivity clause existed separate from the other unenforceable terms in the financing proposal. Contract terms must be definite enough to understand "the duty of each party and the conditions of performance." *Royal Indem. Co. v. Factory Mut. Ins.*, 786 N.W.2d 839, 846 (Iowa 2010). The exclusivity clause here contained a clear, definable duty (exclusivity by Pershing Hill) and consideration (due diligence work by Northwest). The lack of a specified durational limit for the exclusivity duty does not present an insurmountable hurdle to its enforceability. We may find a durational term not expressly stated in a contract where the contract's nature and circumstances imply one. *Shelby Cnty. Cookers, L.L.C. v. Util. Consultants*

*Int'l, Inc.,* 857 N.W.2d 186, 191–92 (Iowa 2014); *see also* 2 Restatement (Second) of Conts. § 204, at 96–97 (A.L.I. 1981) [hereinafter Restatement (Second)]. If we cannot find a duration implied in the contract, we will generally construe an agreement as terminable at will. *Shelby Cnty. Cookers,* 857 N.W.2d at 191. In either case, an enforceable contract may still exist notwithstanding the absence of an express duration.

But this does not end the analysis. Even if the exclusivity clause is independently enforceable, a performance obligation related to it may be discharged by the nonoccurrence of a condition. A "condition" in this sense refers to an event that is not certain to occur but that must occur (or be excused) before performance under a contract is required. 2 Restatement (Second) § 224, at 160; *see also Khabbaz v. Swartz,* 319 N.W.2d 279, 283 (Iowa 1982) (describing a condition as a fact or event "that must exist or occur before there is a right to immediate performance, before there is a breach of contract duty, before the usual judicial remedies are available" (quoting *Mosebach v. Blythe,* 282 N.W.2d 755, 759 (Iowa Ct. App. 1979) (quoting 3A Arthur Linton Corbin, *Corbin on Contracts: A Comprehensive Treatise on the Working Rules of Contract Law* § 628, at 16 (1960)))). The financing proposal described the "Grayfield Tax Credit award documentation" as a "condition to making the Interim Loans available."

On December 11, 2015, Northwest's president sent an email addressing the $800,000 hole left by the failure to receive these tax credits. Northwest presented the options as either to "kill the deal" or to require additional funds from Pershing Hill's partners. With this email, the loan terms in the financing proposal that anchored the exclusivity provision were off the table. Northwest could have excused the failure to receive the tax credits, *see* 2 Restatement (Second) § 225(2) cmt. *b,* at 166, but as the email makes clear, it did not. The

revised loan terms proposed in the email—requiring additional injections of funds from Pershing Hill's partners—were outside the scope of the financing proposal. Northwest's president conceded that the new requirements were significant, acknowledging in the email, "I know that is a lot of money." At this point, the bank's due diligence for the original financing proposal concluded, as did Pershing Hill's reciprocal duty to remain exclusive to the bank for that specific financing structure. *See id.* § 225(2), at 165.

We reject the argument that Pershing Hill somehow remained bound to exclusive negotiations for a proposed deal that the bank itself declared either dead or requiring modification because of the failure to receive the Grayfield tax credits. Since Pershing Hill did not seek alternative financing until *after* the credits had been denied and Northwest had abandoned the proposed loan terms, it did not breach any exclusivity duty while the clause remained in effect. Its duty of exclusivity by that point had been discharged.

Pershing Hill's duty of exclusivity was not unlimited; it was inextricably linked to the specific loan structure in the financing proposal, which in turn was tied to receiving the tax credits. When the failure to receive the tax credits brought an end to those proposed terms, any continuing duty of exclusivity on the part of Pershing Hill likewise came to an end. As a matter of law, there was no breach. We thus affirm the district court's grant of summary judgment on Northwest's breach of contract claim.

**B. Exclusion of the Financing Proposal at Trial.** Northwest argues that the district court abused its discretion by excluding the financing proposal (and any reference to it) from the trial on the fraud claims. The district court's exclusion relied heavily on its summary judgment holding. The court of appeals

concluded the opposite and, as a result, held that the proposal should have been admitted.

Iowa Rule of Evidence 5.403 allows courts to exclude relevant evidence if its probative value is "substantially outweighed by a danger of . . . unfair prejudice, confusing the issues, [or] misleading the jury." The district court reasoned that if Northwest could introduce evidence of the exclusivity clause, "it is going to prejudice the jury, because the jury is going to think that this was an active agreement and the Court has already ruled it was not."

We review rulings under rule 5.403 for abuse of discretion. *State v. Canady*, 4 N.W.3d 661, 668–69 (Iowa 2024). Under an abuse of discretion standard, we will reverse only if the ruling was "clearly untenable or unreasonable." *State v. Tucker*, 982 N.W.2d 645, 657 (Iowa 2022). "Weighing probative value against prejudicial effect 'is not an exact science,' so 'we give a great deal of leeway to the trial judge who must make this judgment call.' " *State v. Lacey*, 968 N.W.2d 792, 807 (Iowa 2021) (quoting *State v. Thompson*, 954 N.W.2d 402, 408 (Iowa 2021)).

The jury instructions required Northwest to prove that Ruhl or Carroll made the alleged fraudulent misrepresentations "between December 11, 2015 through April of 2016." The fraud claim thus centered on whether the defendants misrepresented their negotiations with other lenders *after* the exclusivity agreement had terminated.

We find nothing clearly unreasonable or untenable in the district court's conclusion that admitting the financing proposal might cause the jury to conflate the *defunct* contractual exclusivity duty with the fraud claims. Stated differently, the jury might have concluded that the defendants committed fraud simply because they violated the financing proposal's written terms. As such, admitting

the proposal risked allowing the bank in effect to relitigate the dismissed breach of contract claim under the guise of a fraud claim.

What's more, the exclusion did not prevent Northwest from presenting its case. The bank was permitted to—and did—present extensive testimony regarding the parties' course of dealing and the bank's subjective belief that it remained the exclusive lender. Northwest was able to present the core of its justifiable reliance argument through other means (particularly through the bank president's testimony). The district court could have reasonably concluded that exclusion of the inoperative financing proposal was necessary to prevent unfair prejudice without infringing on the bank's right to present its case.

In short, the district court did not abuse its discretion in weighing the document's probative value against the risk of unfair prejudice, particularly considering the relevant timeframe for the fraud claim. We thus affirm the district court's evidentiary ruling.

III.

For these reasons, we vacate the decision of the court of appeals and affirm the judgment of the district court.

**Decision of the Court of Appeals Vacated; District Court Judgment Affirmed.**

All justices concur except Waterman, J., who takes no part.